**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
: 
CHRISTINE HAZEL S. CRUZ, :
:
Plaintiff, : 17-CV-7685 (PGG) (OTW)
:
-against- : **REPORT & RECOMMENDATION**
:
G-STAR INC., G-STAR USA LLC, and G-STAR :
RAW C.V., :
:
Defendants. :
:
-------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

**To the Honorable Paul G. Gardephe, United States District Judge:**

I. **Introduction**

Plaintiff Christine Hazel S. Cruz brings this action pursuant to the Fair Labor Standards

Act ("FLSA") and New York Labor Law ("NYLL"), for allegedly unpaid overtime wages and spread

of hours premiums and for Defendants' alleged failure to provide certain wage statements and

notices required by the NYLL. Plaintiff also seeks to recover for certain violations of the New

York City Human Rights Law and the New York State Human Rights Law, namely, acts of gender

and racial discrimination, sexual harassment, and retaliation.

Before me for Report and Recommendation is Plaintiff's Motion for Sanctions for

spoliation of electronically-stored evidence ("ESI"). (ECF 42). Plaintiff filed a complaint to

Defendants' Human Resources Department in September 2016. After consulting with outside

litigation counsel, Defendants responded to Plaintiff's Human Resources complaint and

simultaneously discussed terminating her employment. Plaintiff filed a second complaint to

Human Resources in January 2017. Several weeks later, Defendants terminated Plaintiff's employment. Despite the above facts, Defendants did not impose a litigation hold until July 2017. By that time, Defendants had deleted Plaintiff's email account. Defendants also deleted Plaintiff's SAP account in December 2017, despite the litigation hold.

As sanctions for Defendants' loss of her ESI, Plaintiff requests, in the alternative, that the Court strike Defendants' answer and enter a default judgment; strike Defendants' affirmative defenses and issue a preclusion order; or allow the jury to be given an adverse inference instruction. Plaintiff also seeks costs and attorneys' fees. For the reasons that follow, I recommend that Plaintiff's request for an adverse inference instruction be **GRANTED**[1] but that Plaintiff's request to strike Defendants' answer or affirmative defenses be **DENIED**. Because I have authority to decide non-dispositive motions for sanctions,[2] a separate order will follow that rules on Plaintiff's request for costs and attorneys' fees.

---

[1] The Court notes that in at least one instance in the Eastern District of New York a magistrate judge has granted a request for an adverse inference without a Report and Recommendation. *See Rosa v. Genovese Drug Stores, Inc.*, 16-CV-5105 (NGG) (LB), 2017 WL 4350276 (E.D.N.Y. July 31, 2017).

[2] Pretrial matters "not dispositive of a party's claim or defense" may be referred to a magistrate judge for hearing and decision. Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). "Discovery motions, including those seeking sanctions ..., are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), unless the sanction deployed disposes of a claim [or defense]." *Seena Int'l, Inc. v. One Step Up, Ltd.*, No. 15-CV-01095, 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016) (quoting *Lan v. Time Warner, Inc.*, No. 11-CV-2870, 2016 WL 928731, at *1 (S.D.N.Y. Feb. 9, 2016) (internal citations omitted)).

## II.     Background

### A.     Facts[3]

#### 1.     The Parties

Defendants G-Star USA LLC and G-Star Inc. are wholesale and retail denim distributors formed under Delaware law and based in New York. (Declaration of Kathleen M. Kundar dated Nov. 2, 2018 (ECF 50) ("Kundar Decl.") ¶ 3). Effective January 1, 2013, G-Star USA LLC merged with and into Defendant G-Star Inc. (*Id.*). Defendant G-Star Raw C.V., a company headquartered in Amsterdam, is the sole shareholder of G-Star Inc. (*Id.*).

Plaintiff, an Asian female and resident of New York State, was employed by G-Star USA LLC from November 1, 2012 to December 31, 2012, and after the merger, by G-Star Inc. from January 1, 2013 to January 27, 2017. (Compl. ¶¶ 2, 3, ECF 1). Defendants G-Star USA LLC and G-Star Inc. will be referred to collectively as "G-Star" in this Report and Recommendation.

#### 2.     Plaintiff's FLSA and NYLL Claims

Plaintiff began her employment with G-Star in November 2012 as a Senior Sales Back Office Employee in New York City. (Compl. ¶ 14). In that role, she handled problems with the POS system, inventory, and customer service representatives. (*Id.* ¶ 15).

Plaintiff alleges that from her start date to July 2013, she worked approximately 45 hours per week. (*Id.* ¶ 16). Beginning around July 2013, she took on additional responsibilities, which required her to increase her hours. (*Id.* ¶ 17). By 2014, she worked approximately 60

---

[3] The following facts are primarily drawn from Plaintiff's Complaint and reflect her allegations against Defendants.

hours per week. (*Id.*). In December 2015, Plaintiff was promoted. (*Id.* ¶ 22; Kundar Decl. ¶ 40). Her new role required her to continue managing the sales back office, to serve as a liaison between the United States and Amsterdam customer service teams, and to help manage the operations of G-Star-owned franchise stores. (Comp. ¶¶ 21, 23). From December 2015 to January 2017, Plaintiff worked approximately 80 hours per week. (*Id.* ¶ 24).

Plaintiff alleges that she received wage rate notices informing her of her entitlement to an overtime rate of one and one-half times her regular hourly rate. (*Id.* ¶¶ 26-27; Declaration of Sarah M. Matz dated Oct. 1, 2018 (ECF 45) ("Matz Decl."), Ex. 2). She claims she never received overtime payments and was told by senior management that she did not qualify for overtime wages. (Comp. ¶¶ 26-28). Defendants maintain that Plaintiff was an exempt employee. (Answer ¶ 28, ECF 7).

### 3. Plaintiff's Human Rights Law Claims

#### a) Failure to Promote

While employed at G-Star, Plaintiff actively sought a promotion to Retail Account Manager. (Compl. ¶¶ 56-57). Between September 2014 and January 2017, at least six Retail Account Manager positions opened at G-Star. (*Id.* ¶ 63). During that time, Plaintiff took on additional responsibilities, worked overtime, and received positive performance reviews. (*Id.* ¶¶ 75-77). However, she was never considered for a promotion. (*Id.* ¶ 78).

According to Plaintiff, the Caucasian men who were hired or promoted were less qualified than Plaintiff. (*Id.* ¶ 69). Further, in at least one instance, despite her supervisor's knowledge that Plaintiff was interested in a Retail Account Manager position, Plaintiff was not

told of an opening until after one of her colleagues had already accepted the position. (*Id.* ¶¶ 64, 70). Another time she was told there was a hiring freeze in place. (*Id.* ¶ 65).

### b)     Hostile Work Environment

Plaintiff alleges that throughout the course of her employment with Defendants, she was "subject to a pattern of inappropriate, harassing and discriminatory treatment by senior management []." (*Id.* ¶ 32). Among the incidents detailed in Plaintiff's complaint are allegations of inappropriate sexual conduct. Plaintiff alleges that several of her colleagues made multiple unwanted sexual advances towards her. (*Id.* ¶¶ 33, 43). When Plaintiff reported the conduct of one employee to her supervisor, the supervisor took no action and instead joked about the conduct in front of Plaintiff and her colleagues. (*Id*. ¶¶ 34-36). Plaintiff also alleges inappropriate behavior on the part of that supervisor, who allegedly gave Plaintiff an unwanted hug and kiss on the head and sent an email, mistakenly copying Plaintiff, to another of Plaintiff's supervisors commenting on Plaintiff's "ass." (*Id.* ¶¶ 37, 41). The complaint also includes allegations of racially discriminatory conduct and verbal abuse. (*Id.* ¶¶ 47-52).

### c)     Complaints & Termination

As discussed in detail below, between September 24, 2016 and her termination on January 26, 2017, Plaintiff filed two formal written complaints by email to Defendants' Human Resources Department. Immediately after receiving Plaintiff's first complaint, the Head of Human Resources informed Defendants' senior management and sought legal advice from Defendants' outside counsel. Approximately two weeks later, in mid-October 2016, Defendants

discussed terminating Plaintiff, and ultimately terminated her three months later on January 26, 2017.

### i. September 24, 2016: Plaintiff Files Her First Complaint

Plaintiff filed her first formal written complaint by email to Willemien Storm, Head of Human Resources, on September 24, 2016. (Matz Decl., Ex. 8). Plaintiff's complaint included allegations of a hostile work environment, in which Plaintiff was being "unfairly treated" and "overworked." (*Id.*). Plaintiff also accused Kendra Palmer (Defendant's Retail Director) of starting "a conspiracy to unlawfully fire [her]." (*Id.*). In that complaint, Plaintiff mentioned that she had "complained numerous times of how [she is] overworked" to senior management but had been ignored. (*Id.*).

### ii. September 28, 2016: After Consulting With Outside Litigation Counsel, Defendants Respond to Plaintiff's Complaint

Ms. Storm responded to Plaintiff's complaint by email on September 28, 2016, asking for more information and offering to speak to Plaintiff on the phone. (Matz Decl., Ex. 7). That same day, Ms. Storm forwarded her response to Plaintiff to Ms. Palmer, Juan Garcia, then-Vice President of Wholesale, Tony Lucia, then-CEO of North America, and Fanny Smits. (*Id.*). Ms. Storm's email stated, "Please see below the reply that I have sent to Hazel []," indicating that Ms. Storm had already informed them of Plaintiff's complaint. (*Id.*). Ms. Storm's email to Ms. Palmer, Mr. Garcia, Mr. Lucia, and Ms. Smits also relayed legal advice that Ms. Storm had already sought and received from Ms. Kundar, Defendants' outside counsel (and current

litigation counsel in this case).[4] (Matz Decl., Exs. 7, 32 at 97). Defendants' in-house counsel was not informed. (*Id.*, Ex. 32 at 97). On October 1, 2016, Ms. Storm informed Palmer, Garcia, Lucia, and Smits that Plaintiff had responded to her email and that Ms. Storm would call them after she spoke to Plaintiff to discuss next steps. (*Id.*, Ex. 7).

### iii. October 5, 2016: Defendants Email Plaintiff and Become Aware that Plaintiff Has Consulted an Attorney

On October 5, 2016, Ms. Storm responded to Plaintiff's complaint by email. (Matz Decl., Ex. 11). In that email, Ms. Storm addressed Plaintiff's concerns about her workload and requested that Plaintiff send her a screenshot of the text message which Plaintiff alleged demonstrated the existence of a conspiracy to fire her. (*Id.*). Ms. Storm also acknowledged that Plaintiff had told her in a prior telephone conversation that she was not comfortable answering whether she would be prepared to work on improving her relationship with Ms. Palmer until Plaintiff had discussed the matter with her lawyer. (*Id.*). Ms. Storm closed the email with the following statement: "We agreed that you will come back to me after you have consulted your lawyer. In the meantime, I will address the workload issues in the SBO team." (*Id.*).

### iv. October 7, 2016: Plaintiff Responds to Defendants' Email

Plaintiff responded to Ms. Storm two days later, on October 7, 2016, informing Ms. Storm that her lawyer had advised her not to forward the text message. (Matz Decl., Ex. 11). Plaintiff also wrote that "there are witnesses to attest to [the conspiracy]" and "conversations [Palmer] has had with certain employees telling them of her plans to fire [her]." (*Id.*).

---

[4] Although not specified in the emails that have been submitted to the Court, Defendants apparently consulted Ms. Kundar between September 24-28, 2016.

### v. October 10-11, 2016: Defendants Discuss Terminating Plaintiff

On October 10, 2016, Ms. Palmer sent Ms. Storm, Mr. Garcia, and Wouter Geerdink an email listing examples of "behavioral and performance related issues with [Plaintiff]" dating from December 2015 through September 2016. (Matz Decl., Ex. 12).[5] The next day, Ms. Storm responded to Ms. Palmer's email, providing a draft of "the reasons for the employment termination." (*Id.*, Ex. 17). Ms. Storm's email also asked Ms. Palmer and Mr. Garcia to "fill in the blanks" and "send it back to Fanny and myself so I can have it reviewed by the lawyer today." (*Id.*). It is unclear whether Ms. Storm meant Ms. Kundar or Defendants' in-house counsel. No action was taken to terminate Plaintiff at that time.

### vi. October 2016 – January 2017: Defendants Reduce Plaintiff's Workload

After Plaintiff's first complaint, Defendants reduced Plaintiff's workload. Ms. Storm represents that a meeting was held on October 13, 2016, regarding Plaintiff's workload. (Kundar Decl., Ex. C, at 180-81). Ms. Storm also represents that she followed up with Plaintiff "about two weeks" after that meeting. (Kundar Decl., Ex. C, at 181). Plaintiff "was not overly excited" and "not everything was solved at that time." (*Id*. at 182). Plaintiff claims that she was effectively demoted, while Defendants claim they did so to address Plaintiff's complaint that she was overworked. (Comp. ¶¶ 87-88; Kundar Decl. ¶ 40). Plaintiff asserts that she was "not

---

[5] In her Declaration, Ms. Kundar claims that Plaintiff had many performance issues beginning in late 2015, leading Ms. Palmer to take steps to terminate Plaintiff's employment in September 2016, before Plaintiff filed her first complaint. (Kundar Decl. ¶ 40). The record does not include any evidence, however, of any documented efforts to terminate Plaintiff's employment before Ms. Palmer's October 10, 2016 email.

even notified about some of these role reductions [] until after they had been taken away from her, which was [] humiliating and embarrassing." (Comp. ¶ 92).

### vii. January 9, 2017: Plaintiff Files Her Second Complaint

On January 9, 2017, Plaintiff filed a second complaint with Human Resources. (Matz Decl., Ex. 13). That complaint primarily addressed Plaintiff's concern that Ms. Palmer completed performance evaluations for Plaintiff's team (when Plaintiff should have completed those evaluations) while Plaintiff was out of the office on PTO. (*Id.*). Ms. Storm responded to Plaintiff's complaint by email on January 13, 2017. (*Id.*). It appears that Ms. Storm investigated the matter but did not take any action because she believed Plaintiff had already spoken to Ms. Palmer and resolved the matter.

### viii. January 26, 2017: Defendants Terminate Plaintiff

G-Star, Inc. terminated Plaintiff on January 26, 2017. (Matz Decl., Ex. 14). Defendants offered Plaintiff a severance package in exchange for a release of all claims arising out of her employment. (*Id.*). Plaintiff did not accept the severance package and agree to the release. (*Id.*). Instead, in September 2017, Plaintiff filed the instant lawsuit.

### 4. Procedural History & Alleged Spoliation

Plaintiff filed the Complaint in the Supreme Court of the State of New York, County of New York, on September 1, 2017. (ECF 1, Ex. 2). On October 6, 2017, Defendants removed the action to this Court. (ECF 1).  On October 1, 2018, after Judge Gardephe and the undersigned held five conferences setting an initial case management plan, addressing the parties' discovery disputes, and discussing the possibility of settlement, Plaintiff filed the instant motion seeking discovery-related sanctions pursuant to Fed. R. Civ. P. 37 for Defendants' alleged failure to

preserve Plaintiff's electronically stored information, specifically Plaintiff's email account and SAP login and use data.[6] (ECF 42-46). Defendants filed their opposition on November 2, 2018. (ECF 50-53). Plaintiff replied on November 9, 2018. (ECF 57-58).

### a)    March 6, 2017: Defendants Delete Plaintiff's Email

On January 27, 2017, the date of Plaintiff's termination, Plaintiff's email file was shut down, meaning Plaintiff could no longer access it. (Declaration of Rob van der Bent dated Nov. 2, 2018 (ECF 51) ("van der Bent Decl.") ¶¶ 4-5). Mr. Rob van der Bent, a Manager of the Information Communication Technology ("ICT") Support & Procurement Department at G-Star, explained Defendants' document retention and destruction policies. (*Id.* ¶ 2). As a general practice, when an employee is terminated, Human Resources informs the IT helpdesk, and on the date of termination, the employee's Windows account—including their email—is shut down. (*Id.* ¶ 4). Then, approximately two months later, ICT deletes the employee's account. (*Id.* ¶ 6). On March 6, 2017, ICT noticed that Plaintiff's Windows account had not yet been deleted. (*Id.* ¶ 6). There being no record of a hold on the account, ICT deleted it. (*Id.* ¶ 6).[7]

---

[6] SAP is a program Plaintiff used during her employment with Defendants to enter sales orders, run reports, and send reports to account managers. (Cruz Decl. ¶¶ 5-6).

[7] Ms. Kundar initially told Plaintiff and this Court that Plaintiff's email account was deleted on June 3, 2017. Ms. Kundar now affirms that Defendants told her Plaintiff's email account was deleted on June 3, 2017, and so she told Plaintiff's counsel and the Court the same. (Kundar Decl. ¶ 29). However, Mr. van der Bent now represents that he misapprehended the date of deletion. (*Id.* ¶ 9). The date of deletion is written in G-Star's log as 03/06/2017; Mr. van der Bent assumed it was written in the European style (day before month). *Id.* When he saw that June 3, 2017 was a Saturday (and the deletion would not have occurred on a Saturday because it had to be done manually), Mr. van der Bent states that he realized that the date of deletion was in fact March 6, 2017. (*Id.*).

### b) March 2017 – October 2017: Pre-Litigation Contacts Between Counsel; Ms. Kundar Informs Defendants of the Need for a Litigation Hold

Gary Adelman, one of Plaintiff's attorneys, telephoned Defendants "in or around late March of 2017" and left a message regarding claims Plaintiff contemplated bringing against Defendants. (Declaration of Gary Adelman dated Oct. 1, 2018 (ECF 43) ("Adelman Decl.") ¶ 3). Ms. Kundar returned the call on April 3, 2017. (*Id.* ¶ 4; Kundar Decl. ¶ 13). On that call, Mr. Adelman told Ms. Kundar that Plaintiff planned to pursue claims against Defendants for FLSA violations, sexual harassment, hostile work environment, and race and gender discrimination. (Adelman Decl. ¶ 4). In response, Ms. Kundar asked him to send her a letter outlining the contemplated claims. (*Id.* ¶ 5). To facilitate this, she sent him a "test email" with her contact information. (*Id.*, Ex. 1). Ms. Kundar maintains that Mr. Adelman told her "he was retained to look into" such claims and would get back to her. (Kundar Decl. ¶ 13).

Also at this time, "in March or April of 2017," Defendants received a phone call from Mourad Elayan, a former franchisee of G-Star, informing them that Plaintiff was going to sue G-Star. (Defs. Mem. of Law at 4; Kundar Decl., Ex. D, at 21-22). Defendants represent that Mr. Elayan had made several prior threats to sue G-Star which never materialized. (Defs. Mem. of Law at 4). Nevertheless, after receiving this information, Ms. Palmer asked Human Resources whether Plaintiff had returned her severance agreement. (Kundar Decl., Ex. D, at 22). Human Resources told Ms. Palmer that Plaintiff had not returned the agreement. (*Id.*).

On July 20, 2017, Plaintiff sent a letter to Defendants outlining Plaintiff's claims and stating her intention to file a formal legal action. (*Id.*, Ex. H). It was at this time that Ms. Kundar

first spoke to in-house counsel about the need to preserve evidence, and emailed Defendants'
Human Resources an initial list of documents to assemble for use in litigation. (*Id.* ¶ 15). The
record does not show any efforts by Ms. Kundar or in-house counsel to preserve evidence
before this time. Presumably, it was either Ms. Kundar or in-house counsel who directed Mr.
van der Bent to put a litigation hold on Plaintiff's and other's email accounts; however, Ms.
Kundar does not say she did so, and in-house counsel has not provided a declaration. In any
event, Mr. van der Bent affirms that in late July 2017 he was told to "put a hold on various
email accounts," including Plaintiff's, because "litigation had been threatened." (van der Bent
Decl. ¶ 7). According to Mr. van der Bent, ICT put a hold on the requested email accounts, but
in doing so, no one noted that Plaintiff's email account had already been deleted. (*Id.).*

On September 1, 2017, Plaintiff filed her Complaint in state court. Ms. Kundar emailed
to Defendants' in-house counsel and Human Resources representatives an extended list of
documents needed for the litigation on October 2, 2017. Ms. Kundar represents that she noted
"[w]e eventually will have to p[roduce] many emails from the years of Hazel's edmployment
[sic]. I will work on a list of reasonable search terms." (Kundar Decl. ¶ 18). Ms. Kundar did not,
however, provide this email to the Court in connection with this motion.

> c) **October 2017 – July 2018: Parties Attend Pretrial Proceedings
> and Engage in Discovery; Defendants Fail to Disclose the
> Deletions**

Defendants removed the action to federal court on October 6, 2017 and filed their
Answer on October 12, 2017. (ECF 1, 7). Shortly thereafter, Judge Gardephe scheduled an Initial
Pretrial Conference ("IPC") for January 2018. Before the IPC before Judge Gardephe, the parties

had their telephonic Rule 26(f) conference, during which Ms. Matz told Ms. Kundar of Plaintiff's intention to seek her email communications. (Matz Decl. ¶ 20). Ms. Kundar insists she did not know at that time that Plaintiff's emails had already been deleted. (*Id.*). Ms. Kundar assumed the emails had been preserved based on her specific mention of them in the list of documents she had emailed to Defendants' in-house counsel and Human Resources representatives on October 2, 2017. (*Id.* ¶¶ 18, 22). According to Ms. Kundar, Ms. Matz did not mention Plaintiff's SAP account at that time. (Kundar Decl. ¶ 22).

The IPC was held on February 1, 2018 before Judge Gardephe, at which a civil case management plan and scheduling order was entered. (ECF 16). Pursuant to that scheduling order, Plaintiff served her first Requests for Production in March 2018, requesting, among other items, documents evidencing the time and date of Plaintiff's logins to SAP. (Matz Decl., Ex. 18, at 8). Plaintiff also requested items relating to Plaintiff's email use, including a "table style printout of Plaintiff's sent and received email[s]." (*Id.*, Ex. 18, at 9).

In response, Defendants' in-house counsel directed Mr. van der Bent to "search for various emails relating to G-Star Inc and [Plaintiff]" and instructed ICT "not to delete [Plaintiff's] account and files attached to that account." (van der Bent Decl. ¶ 8). Defendants' in-house counsel also instructed Mr. Klaas Buist, another ICT Manager, to provide documents and communications evidencing the time and date of Plaintiff's logins to or use of SAP. (Declaration of Klaas Buist dated Nov. 2, 2018 (ECF 52) ("Buist Decl.") ¶ 5). In response, Mr. van der Bent informed in-house counsel that Plaintiff's email account had been deleted. (van der Bent Decl. ¶ 8). According to Mr. Buist, Plaintiff's SAP account was locked on May 17, 2017. (*Id.* ¶ 7). Deletion of SAP accounts occurs "a few months after locking" absent a litigation hold. (*Id.*). Mr.

13

Buist asserts that Plaintiff's SAP account was deleted in December 2017 during a "periodic clean-up." (*Id.*). Because Plaintiff's email account had already been deleted, a "glitch" in the hold process occurred and the ICT individuals performing SAP deletions were not informed of the litigation hold on Plaintiff's SAP account. (*Id.*). Defendants do not explain what this "glitch" was, or why Ms. Kundar's communications with in-house counsel regarding document preservation in July 2017 and September 2017 were insufficient to preserve Plaintiff's SAP account.

Defendants' in-house counsel informed Ms. Kundar in late March 2018 that Plaintiff's email had been deleted. (Kundar Decl. ¶ 24). Immediately thereafter, at the request of in-house counsel, Mr. van der Bent attempted to reconstruct Plaintiff's email file—in .pst format—from archived records. (van der Bent Decl. ¶ 11). Some of Plaintiff's emails were fully recovered in their original format (complete email chain, including attachments), while others are now available only in archived format, lacking most of each email's content, but showing the sender, recipient, and timestamp. (*Id.*; Matz Decl., Ex. 15, at 7:14-19). Some archived emails show only the sender and the timestamp, not the recipient. (Matz Decl., Ex. 45). Reconstructing Plaintiff's email file took five business days. (van der Bent Decl. ¶ 11).

Defendants did not disclose these deletions in their written responses, which were served on April 9, 2018.[8] (*Id.*, Ex. 19). Instead, Defendants objected to Plaintiff's request for

---

[8] Ms. Kundar was aware by April 9, 2018 that Defendants had deleted Plaintiff's email, (*Id.* ¶ 24), but she did not disclose this information to Plaintiff. It is unclear whether Ms. Kundar was also aware by April 9, 2018 that Plaintiff's SAP information had been deleted. Although Plaintiff's SAP information had been deleted some four months earlier, Defendants did not disclose the deletion, and Ms. Kundar represents that she did not learn of the SAP file's deletion until an unspecified date in April 2018. (Kundar Decl. ¶ 26).

documents evidencing the time and date of Plaintiff's logins to SAP on the ground that the request was "overly broad, unduly burdensome, vague and ambiguous." (*Id.*, Ex. 19, at 15). Defendants specifically noted that they did not possess "login reports, logs, and/or audit trails." (*Id.*). As to the request for a "table style printout of Plaintiff's sent and received email[s]," Defendants objected on the grounds that (1) the request is "overly broad, unduly burdensome, oppressive, vexatious, and harassing"; (2) the request "seeks the disclosure of documents that are shielded from disclosure by the attorney work product doctrine"; (3) the request "seeks the disclosure of confidential, proprietary, or sensitive information"; and (4) the request seeks disclosure of "documents and information that are not relevant to this litigation and is not reasonably calculated to lead to the discovery of admissible evidence." (*Id.* at 15-16).

On May 2, 2018, the parties met and conferred regarding Defendants' initial responses and production. (Matz Decl. ¶ 21). The parties discussed, among other issues, Defendants' failure to produce a "table style printout of Plaintiff's sent and received email[s]." (*Id.*). The next day, the parties appeared for a status conference before Judge Gardephe, who referred this case to the undersigned for settlement. (ECF 20). On May 22, 2018 and May 24, 2018, counsel again met and conferred about the outstanding discovery, which still included a request for a table style printout of Plaintiff's sent and received emails and Plaintiff's SAP data. (Matz Decl. ¶¶ 26-27, 29). This Court held a pre-settlement conference on June 19, 2018, during which the parties informed the Court of a planned private mediation. A follow-up call was held on June 28, 2018. On that call, the parties informed the Court that they did not settle at mediation. At no time during any of these calls or conferences did Defendants disclose—either to Plaintiff's counsel, the undersigned, or Judge Gardephe—that Plaintiff's email account and SAP data had

been deleted, or that Defendants had tried to reconstruct Plaintiff's email and had been unable to do so. (*Id.* ¶¶ 21, 26-27).

On June 20, 2018, Defendants served an amended response to Plaintiff's document requests. (*Id.*, Ex. 22). In response to Plaintiff's request for a "table-style printout" of Plaintiff's emails, Defendants objected on the grounds that (1) the request is "overly broad, unduly burdensome, oppressive, vexatious, and harassing"; and (2) the request seeks disclosure of "documents and information that are not relevant to this litigation and is not reasonably calculated to lead to the discovery of admissible evidence." (*Id.*, Ex. 22, at 16). In early July, Defendants proposed that the parties use keyword search terms to identify relevant documents. (*Id.*, Ex. 9). Not having resolved their disputes, the parties submitted a joint letter to Judge Gardephe outlining their outstanding discovery issues and requesting a conference on July 18, 2018. (ECF 27). In that letter, Defendants represented that they had "been working with their e-discovery consultant to produce relevant documents from Plaintiff's email file and eight other custodians' email files." (ECF 27, at 4-5). On July 23, 2018, Judge Gardephe issued an amended Order of Reference to this Court to address the specific discovery disputes. (ECF 28). This Court thereafter ordered the parties to meet and confer on the issues raised in their July 18, 2018 letter and scheduled a discovery conference for August 2, 2018. (ECF 29).

### d) July 26, 2018: Defendants Disclose the Deletion of Plaintiff's ESI

On July 26, 2018, the parties met and conferred by phone in preparation for the August 2, 2018 conference. On that call, Ms. Kundar told both Ms. Matz and Mr. Adelman for the first time that Defendants had deleted Plaintiff's email and SAP accounts. (Matz Decl. ¶ 31; Adelman

Decl. ¶ 6; Kundar Decl. ¶ 34). Ms. Kundar sent a follow-up email later that day attaching G-Star policies (Matz Decl., Ex. 23). The attached policies appear to relate to SAP and other programs, but not email accounts. (*Id.*, Ex. 24). In her July 26, 2018 email, Ms. Kundar wrote that "G-Star reports that mailboxes are deleted two months after the termination date unless blocked by HR or Legal in accordance with the IT Audit policy." (*Id.*, Ex. 23). Defendants have not provided a copy of their policy regarding deletion of email accounts.

In Defendants' opposition, Ms. Kundar admits that she did not disclose the deletions before this time because "in-house counsel had not yet sent us a more detailed report," Defendants were "try[ing] to identify other sources for the requested information," Defendants were "speaking with an e-discovery consultant to assist with the email review of other custodians," the parties "had stated an interest in settlement," and Defendants "might yet find a substitute way to provide what had been deleted," notwithstanding Defendants unsuccessful attempt months earlier to reconstruct Plaintiff's email file. (Kundar Decl. ¶¶ 27, 30).

### e) August 2, 2018: Court Orders Defendants to Produce Plaintiff's .pst File

On August 2, 2018, the parties appeared before the undersigned for a discovery conference. At that conference, Plaintiff's counsel argued that Defendants should be required to turn over Plaintiff's entire email file. (August 2, 2018 Transcript at 4:10-17). In response, Ms. Kundar argued that Defendants, before producing Plaintiff's emails, would have to review over 100,000 emails "to see what is there that may be confidential" or "involve trade secrets" and that such an undertaking would not be proportional to the action. (*Id.* at 6:3-12). Ms. Kundar also informed the Court for the first time that Defendants had deleted Plaintiff's email file, and

Ms. Mevorah (Ms. Kundar's co-counsel) explained to the Court and Plaintiff's counsel that the .pst file includes emails in both "their original format" and "archived format." (*Id.* at 7:14-24). After hearing argument from both parties, the Court ordered Defendants to produce Plaintiff's .pst file in its entirety to Plaintiff's counsel by August 9, 2018.

**f)     August 9, 2018: Defendants Produce Plaintiff's .pst Email File**

Pursuant to this Court's directive, Defendants delivered a thumb drive containing Plaintiff's .pst email file to Plaintiff on August 9, 2018. (Matz Decl., Ex. 25). Of the 114,812 emails contained in the .pst file, 109,117, or approximately 95%, are in the archived format. (Pl. Mem. of Law at 7). 200 emails are virtually blank. (Pl. Mem. of Law at 8).[9]

In addition to the .pst email file, Defendants produced 2,541 pages of complete emails, (Kundar Decl., Ex. M), and complete versions of 2016 emails showing Plaintiff's work schedule on certain dates. (Kundar Decl. ¶ 39). Defendants do not identify where or how they obtained these emails. Ms. Kundar did represent that Defendants identified other employees whose email files would contain messages to or from Plaintiff or would have copied Plaintiff. (*Id.* ¶ 25). Specifically, Defendants preserved seven other custodians' email files for use in this litigation.[10] (*Id.* ¶ 33). The record is devoid of any evidence, however, on whether a search of these

---

[9] Plaintiff provided copies of the 109,117 emails in archived format to the Court. The compact disc provided, however, was itself corrupted and thus the Court was unable to view the disc's contents. As represented by Plaintiff, the archived emails are incomplete. (Pl. Mem. of Law at 7-8; Matz Decl. ¶ 36). Defendants do not dispute that there is a loss of information in the archived form. (August 2, 2018 Transcript at 7:14-25, 8:1-3).

[10] Defendants still have not disclosed the identities of these custodians to Plaintiff or the Court.

custodians' email files was ever conducted, and if so, whether the 2,541 pages and 2016 emails are the results of such a search.

### g) October 2018: Defendants Attempt to Restore Plaintiff's SAP Data

In October 2018, Defendants attempted to restore Plaintiff's SAP data, which Defendants had deleted ten months earlier. In October 2018, with the assistance of a technical specialist, Mr. Buist was able to obtain data showing the date and time of each sales order created by Plaintiff's username. (Buist Decl. ¶ 10). Defendants produced tables from the SAP system for 2014-2017 showing the times Plaintiff used the SAP system to enter orders. (Kundar Decl. ¶ 37). Mr. Buist does not explain whether more information—such as Plaintiff's log-in and log-out times and data regarding the running and sending of reports—would have been available had Defendants not deleted Plaintiff's SAP account. Finally, Defendants produced "more than 1,000 pages of daily log-in information for the office computers used by Plaintiff," weekly attendance lists, and Plaintiff's absence record. (Kundar Decl. ¶ 39).

## III. Analysis

### A. Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999).

Rule 37(e) of the Federal Rules of Civil Procedure, amended in 2015, governs sanctions for failure to preserve ESI, and provides as follows:

(e) **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of

litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)        Upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)        Only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

        (A)        Presume that the lost information was unfavorable to the party;

        (B)        Instruct the jury that it may or must presume the information was unfavorable to the party; or

        (C)        Dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

District courts in the Second Circuit have recognized that Rule 37(e) replaces the prior framework for spoliation claims for failure to preserve ESI. *See Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-CV-9363, 2018 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018) ("Rule 37(e) of the Federal Rules of Civil Procedure, as amended in 2015, governs sanctions for failure to preserve ESI"); *Leidig v. Buzzfeed, Inc.*, No. 16-CV-542, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017) ("Rule 37(e) amended the traditional spoliation rules as it related to ESI in a number of ways."); *In re Bridge Constr. Servs. of Fla., Inc.*, 185 F. Supp. 3d 459, 472-73 (S.D.N.Y. 2016) ("The recent Amendments to Rule 37(e) of the Federal Rules of Civil Procedure have changed the rules relating to spoliation when it involves Electronically Stored Information ("ESI").").

Sanctions are only available under Rule 37(e) where certain threshold elements are met. The Court must first determine: (1) whether Defendants had an obligation to preserve Plaintiff's ESI in the anticipation or conduct of litigation; (2) whether Plaintiff's ESI was lost because Defendants failed to take reasonable steps to preserve it; and (3) whether Plaintiff's ESI can be

restored or replaced through additional discovery. Fed. R. Civ. Pro. 37(e). Only if these three

elements are met will the Court turn to deciding the appropriate sanction.

Pursuant to the amended Rule 37(e), Plaintiff must show that Defendants "acted with

the intent to deprive [Plaintiff] of the information's use in the litigation" before the sanctions

listed in subsection (2) of Rule 37(e)—i.e., adverse inference, dismissal, or default judgment—

are available. Fed. R. Civ. P. 37(e)(2). Absent a showing of "intent to deprive," Plaintiff's relief is

limited to sanctions under subsection (1) of Rule 37(e). Fed. R. Civ. P. 37(e)(1). A Rule 37(e)(1)

sanction may only be imposed upon a finding of prejudice from the loss of the information, and

the sanction imposed may be "no greater than necessary to cure the prejudice." Fed. R. Civ. P.

37(e)(1). When fashioning such a sanction, "[c]are must be taken . . . to ensure that curative

measures under subdivision (e)(1) do not have the effect of measures that are permitted under

subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's

use in litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

B.    **Analysis**

1.    **Defendants' Duty to Preserve Plaintiff's ESI Arose in October 2016**

"Identifying the boundaries of the duty to preserve involves two related inquiries: when

does the duty to preserve attach, and what evidence must be preserved?" *Zubulake v. UBS*

*Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  Generally, "[t]he obligation to preserve

evidence arises when the party has notice that the evidence is relevant to litigation or when a

party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v.*

*Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). The obligation arises "most commonly

when suit has already been filed, providing the party responsible . . .  with express notice, but

also on occasion . . . when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998).

The parties disagree over when the duty to preserve arose in this case. Plaintiff argues that Defendants had a duty to preserve Plaintiff's emails and SAP data as early as October 2016, when Plaintiff filed her first complaint to Human Resources. Alternatively, Plaintiff argues that the duty to preserve arose no later than April 2017, when Mr. Adelman spoke to Ms. Kundar. Defendants argue that the duty to preserve evidence did not arise until at least July 20, 2017, when Defendants' counsel received a letter from Plaintiffs' counsel threatening litigation. It is undisputed that no one sought to preserve evidence in this case until "late July 2017." (van der Bent Decl. ¶ 7; Kundar Decl. ¶ 15-16; Def. Mem. of Law at 5).

Defendants had a duty to preserve no later than October 2016. Within four days of receiving Plaintiff's complaint, Ms. Storm, Defendants' Head of Human Resources, informed members of Defendants' senior management—Ms. Palmer, Retail Director; Mr. Garcia, the Vice President of Wholesale; and Mr. Lucia, CEO of North America—of Plaintiff's complaint, sought legal advice from Defendants' outside litigation counsel, Ms. Kundar, and forwarded that legal advice to Ms. Palmer, Mr. Garcia, and Mr. Lucia. (Matz Decl., Ex. 7). Further communications between those employees within three weeks of Plaintiff's complaint show Defendants' intent and efforts to terminate Plaintiff, which included careful documentation and consultation with an attorney. (*Id.*, Ex. 17).[11] Additionally, the email exchange between Ms. Storm and Plaintiff in

---

[11] It is unclear whether Defendants consulted with Ms. Kundar, in-house counsel, or another attorney regarding their efforts to terminate Plaintiff in October 2016.

early October 2016 indicates Ms. Storm's awareness that Plaintiff was actively consulting with an attorney regarding the matters included in her Human Resources complaint. (*Id.*, Ex. 11). These circumstances combined with the content of Plaintiff's complaint make clear that the relevant people at G-Star anticipated litigation by October 2016. Thus, Defendants' duty to preserve arose at that time. *See Zubulake*, 220 F.R.D. at 217 (emails between plaintiff's co-workers and supervisors supported conclusion that relevant people at defendant's company anticipated litigation).

The next issue is whether Defendants' duty extended to Plaintiff's email and SAP information. A party is not required to preserve "every document in its possession." *Zubulake*, 220 F.R.D. at 217. However, "[a party] is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Id.* (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). A party's duty to preserve extends to any evidence "likely to have discoverable information that the disclosing party may use to support its claims or defenses." *Id.* at 218 (citing Fed. R. Civ. P. 26(a)(1)(A)). The duty also extends to information that is relevant to the claims or defense of any party, or which is "relevant to the subject matter involved in the action." *Id.* at 218 (citing Fed. R. Civ. P. 26(b)(1)). Defendants' preservation obligation "runs first to counsel, who has a duty to advise [their] client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 437 (S.D.N.Y. 2010). Similarly, Defendants' corporate managers are responsible for conveying this information to the relevant employees. *Turner*, 142 F.R.D. at

73. Here, Defendants' duty extended, at a minimum, to Plaintiff's email communications and SAP data. Defendants' senior management and outside litigation counsel, aware that Plaintiff had complained of a hostile work environment and of a conspiracy to fire her, (and who shortly thereafter engaged in discussions planning to terminate her), should have known that both Plaintiff's email account and SAP data needed to be preserved in the event of future litigation. Indeed, even non-content information from Plaintiff's emails and SAP account would have been relevant to Plaintiff's complaint to Human Resources in September 2016 that she was being "overworked," for example, if that information showed that Plaintiff was accessing the SAP system or attending to emails at night and on weekends. Defendants thus should have anticipated at the time that their duty arose, no later than October 2016, that their duty to preserve extended to both Plaintiff's emails and Plaintiff's SAP account.

### 2. Defendants Failed to Take Reasonable Steps to Preserve Plaintiff's ESI

"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake*, 220 F.R.D. at 218. Once a litigation hold is in place, defense counsel must "oversee compliance with [the] litigation hold, monitoring the party's efforts to retain and produce the relevant documents," and "become fully familiar with [their] client's document retention policies, as well as the client's data retention architecture." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431-32 (S.D.N.Y. 2004).

Despite having reason to anticipate litigation in October 2016, Ms. Kundar did not instruct Defendants to impose a litigation hold until late July 2017, nearly a year later. By that

time, Defendants had already deleted Plaintiff's email account. Before July 2017, no steps were taken to preserve Plaintiff's ESI. From October 2016 to March 2017 (when Plaintiff's emails were deleted), Defendants sought and received legal advice from Ms. Kundar regarding Plaintiff's first complaint, became aware that Plaintiff was consulting with an attorney on the matters raised in her first complaint, documented Plaintiff's performance issues, terminated Plaintiff's employment, and did not receive from Plaintiff a release of all claims arising out of her employment after her termination. Notwithstanding Ms. Kundar's active participation in advising Defendants as early as October 2016, at no time did Ms. Kundar instruct Defendants to impose a litigation hold.

Further, Defendants deleted Plaintiff's SAP account in December 2017 despite the litigation hold. This deletion reflects that neither Defendants nor their counsel took "reasonable steps" to preserve Plaintiff's SAP account even after Plaintiff's Complaint had been filed. *See Zubulake*, 220 F.R.D. at 220 ("Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent."). Ms. Kundar's excuse that she was not aware of Plaintiff's SAP files is of no merit. Indeed, Ms. Kundar's ignorance of Plaintiff's SAP files (and both her and in-house counsel's ignorance of Plaintiff's emails' deletion until March 2018) indicates that neither counsel monitored Defendants' compliance with the litigation hold as required. "Counsel must take affirmative steps to monitor compliance [with a litigation hold] so that all sources of discoverable information are identified and searched." *See Zubulake*, 229 F.R.D. at 432. Such steps include "becom[ing] fully familiar with" the client's "document retention policies" and "data retention architecture," a task which requires "speaking with information technology personnel," and "communicating with the 'key players' in the litigation." *Id*. No such steps

appear to have been taken here. The full extent of Ms. Kundar's efforts to monitor compliance appear to be a call to Defendants' in-house counsel, and two emails (one on July 25, 2017 and one on October 2, 2017) with lists of documents to assemble. All of these efforts took place months after the ESI was destroyed, and months after Ms. Kundar had reviewed Plaintiff's internal complaint and had advised her clients on a response. Additional efforts by in-house counsel are unknown. These efforts are simply insufficient. *Cf. Zubulake*, 229 F.R.D. at 432. Indeed, Mr. Buist's explanation that Plaintiff's SAP information was deleted because of an unspecified and unidentified "glitch" somehow related to Defendants' prior deletion of Plaintiff's email does not inspire confidence that Ms. Kundar or any other defense counsel has any understanding of their clients' document retention policies and data retention architecture.

### 3.    Plaintiff's ESI Cannot Be Restored or Replaced

The next question is whether the missing information can be restored or replaced through additional discovery. Based on the information before the Court, it appears that it cannot. Defendants have not been able to restore Plaintiff's full email file. Indeed, Defendants acknowledge that the emails reconstructed in archived format do not include all the content that would have been found in the emails had they been properly and timely preserved. (van der Bent Decl. ¶ 11).

Instead, Defendants argue that Plaintiff's email file can be "replaced" by obtaining the emails from other sources, namely, the other parties on Plaintiff's emails. Ninety-five percent of Plaintiff's email file is incomplete. It would be nearly impossible for Plaintiff to obtain 109,117 emails from third parties. Further, not all the reconstructed emails identify the recipient. (Matz Decl., Ex. 45). Defendants also suggest that Plaintiff's emails can, to an extent, be replaced by

searching the email accounts of seven custodians whose email files have been preserved. (Kundar Decl. ¶¶ 33, 36). It does not appear, however, that such a search has been conducted, making it impossible for this Court to evaluate its efficacy. Moreover, it cannot be that 100% of Plaintiff's relevant emails could be found in seven custodians' email files, and Defendants are silent as to whether any email files besides these seven custodians' have been preserved. Thus, the Court cannot find, on the present record, that Plaintiff's email file can be replaced.

The cases cited by Defendants are inapposite. This is not a situation where Defendants have produced the full emails from other sources or where the record does not support the emails' existence in the first place. *Cf. Greer v. Mehiel*, No. 15-CV-6119, 2018 WL 1626345, at *8 (S.D.N.Y. Mar. 29, 2018) (no sanctions where copies of emails allegedly spoliated were produced by another party and where there was no evidence in the record of the existence of a "smoking gun" email that had been deleted"); *Gurvey v. Cowan, Leibowitz & Latman, P.C.*, 2013 WL 3718071, at *18 (S.D.N.Y. July 15, 2013). In the instant case, Defendants—the only ones with access to and control over Plaintiff's email file—have not produced (and cannot produce) Plaintiff's full email file, the discovery she seeks. That Plaintiff may have saved certain emails or obtained copies of certain emails from third parties does not show that her *entire* email file, of which 95% or more are unavailable in their full format, can be replaced.

Similarly, the record is insufficient to show that Plaintiff's SAP data can be restored or replaced. The tables showing Plaintiff's SAP data show the date and time Plaintiff's username entered an order into the system but do not contain log-in times or other evidence of use such as running of reports. (Pl. Reply at 10, ECF 57). They are also limited to 2014-2017. (*Id.*). Because Defendants are unable to produce Plaintiff's log-in and report information as well as

her information from 2013 and 2014, the reconstructed SAP data is incomplete. Plaintiff's SAP Information was lost and cannot adequately be restored or replaced.

### 4. Plaintiff Has Been Prejudiced by Defendants' Failure to Preserve ESI

Federal Rule of Civil Procedure 37(e)(1) permits the imposition of sanctions only when there is "prejudice to another party from loss of the information." Fed. R. Civ. P. 37(e)(1). Neither Rule 37 nor its Advisory Committee note define "prejudice," except to note that "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. "The rule does not place a burden of proving or disproving prejudice on one party or the other." *Id.* Rather, Rule 37 "leaves judges with discretion to determine how best to assess prejudice []." *Id.*

Prejudice to Plaintiff from the deletion of her email and SAP account is apparent. Approximately 95% of Plaintiff's emails are in the archived format. Plaintiff's emails in the archived format show the sender and the timestamp; they may also show the recipient. They do not show all of the content. The information that would have been contained in the full emails is probative of the hours Plaintiff worked and the nature of her employment, and is thus relevant to Plaintiff's FLSA and NYLL claims. To prosecute her labor law claims, Plaintiff needs not only timestamps, but also the content of her emails, which would show the nature of Plaintiff's work and her primary duties and responsibilities. Without the content, Plaintiffs' ability to show the work she performed during those hours and to defend against Defendants' exemption defense is diminished. Similarly, Plaintiff needs the content of her emails to prove

her human rights law claims, specifically to show, among other things, the quality of her work, interactions with clients and co-workers, treatment by supervisors, interest in promotions, disparate treatment, and retaliatory acts. Defendants' actions deprived Plaintiff of this information, and in doing so, hampered her ability to prove her claims. By deleting this information, Defendants denied Plaintiff the ability to corroborate her testimony at trial, plainly weakening her case. Neither Defendants' production (2,541 pages of complete emails and 1,000 pages of daily log-in information) nor the fact that Plaintiff produced some of her emails in complete form eliminates this prejudice.

### 5. Intent to Deprive

The Court now turns to whether Rule 37(e) sanctions should be imposed. Plaintiff must show that Defendants acted with the "intent to deprive" before Rule 37(e)(2) sanctions are available. Absent such a showing, Plaintiff's relief is limited to Rule 37(e)(1) sanctions.

Here, the circumstances surrounding Defendants' spoliation of ESI support an inference that Defendants acted with the intent to deprive Plaintiff of evidence. Defendants' duty to preserve arose no later than October 2016 when Defendants consulted their outside litigation counsel, Ms. Kundar. After that time, Defendants had an obligation to preserve Plaintiff's ESI in the anticipation or conduct of litigation, yet Defendants took no reasonable steps to preserve Plaintiff's ESI, and now that ESI cannot be restored or replaced through additional discovery. Plaintiff's emails and SAP information were lost because Defendants failed to take *any* steps to preserve them prior to their deletion. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (failure "to take any reasonable steps to preserve" relevant evidence

satisfies the requisite level of intent required by Federal Rule of Civil Procedure 37(e)(2)); *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018) ("[w]hether the spoliator *affirmatively* destroys the data, or *passively* allows it to be lost, is irrelevant; it is the spoliator's *state of mind* that logically supports the adverse inference"). Defendants' failure to take *any* steps to preserve Plaintiff's emails is particularly troubling because the particular individuals who received and discussed Plaintiff's first complaint to Human Resources—and consulted outside litigation counsel on a proper response—were the same individuals creating lists of reasons to terminate Plaintiff just two weeks later.

Defendants' failure to impose a litigation hold before July 2017 was "so stunningly derelict as to evince intentionality." *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 431-32 (W.D.N.Y. 2017). In October 2016, Defendants—aware that Plaintiff had actively consulted with an attorney on matters included in her internal complaint, and who themselves sought and received advice from outside litigation counsel and began taking steps to terminate Plaintiff's employment—did not impose a litigation hold.  In early January 2017, Plaintiff filed a second complaint to Human Resources, but Defendants again chose not to impose a litigation hold. In late January 2017, after Defendants terminated Plaintiff's employment, Defendants again failed to impose a litigation hold. In March 2017, after Ms. Palmer noticed that Plaintiff had not returned the release of all claims arising out of her employment, and two months after Plaintiff's termination, Defendants still did not impose a litigation hold. In April 2017, Mr. Adelman called Ms. Kundar regarding Plaintiff's claims, but Defendants still did not impose a litigation hold. At each occasion, Defendants had more information and more reason to impose a litigation hold that would have preserved Plaintiff's ESI. Defendants failed at every

opportunity. Such repeated failure, especially considering Ms. Kundar's involvement in providing advice since October 2016, evidences an intent to deprive. *See Moody*, 271 F. Supp. 3d at 431-432 ("defendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations . . . evince[s] intentionality"); *O'Berry v. Turner*, No. 15-CV-0064, 2016 WL 1700403, at *4 (M.D. Ga. Apr. 27, 2016) ("severe measures . . . are most appropriate to remedy the wrong"; "additional efforts to ensure the preservation of these materials once the spoliation letter was received" should have been made; "[s]uch irresponsible and shiftless behavior can only lead to one conclusion—that [defendants] acted with the intent to deprive").

Further, the Court's finding of bad faith "is buttressed by [the defendants'] conduct in connection with litigating the deletion issue." *GN Netcom, Inc. v. Plantronics, Inc.*, No. 12-CV-1318, 2016 WL 3792833, at *8 (D. Del. July 12, 2016). A review of the docket reveals that both Plaintiff's counsel and the Court expended significant resources in motion practice and discovery conferences which would have been avoided had Defendants properly investigated or timely disclosed the deletion. Defendants' counsel was made aware of the deletion in March 2018, yet, Defendants' counsel—knowing that Plaintiff's emails had been deleted—attended three meet and confers, appeared at a status conference before Judge Gardephe, and appeared for two telephonic pre-settlement conferences before this Court, never disclosing the deletion. As late as July 18, 2018, in a joint letter to Judge Gardephe, in which Plaintiff requested a pre-motion conference in anticipation of moving to compel production of Plaintiff's email file, (ECF 27), Defendants' counsel did not disclose the Plaintiff's emails had been deleted. During this period of over a year, Defendants not only failed to disclose the deletions, but also

misrepresented to Plaintiff and the Court (by omission) their ability to produce Plaintiff's emails. Instead, Defendants interposed objections that suggested the existence of Plaintiff's emails and that counsel had reviewed those emails, when in fact Defendants knew the emails no longer existed. Defendants also proposed using key word search terms, despite knowing that most of the content of Plaintiff's emails had been deleted, and thus using search terms would have been futile. The email from Defendants' counsel proposing the use of search terms does not state whether Defendants intended to search Plaintiff's email file or those of other custodians; however, it should have been clear to Defendants at that point that a keyword search would not adequately substitute for Plaintiff's email file, and that Plaintiff's counsel should be informed of its deletion. Defendants still did not do so. Taken together, Defendants' litigation conduct evinces an intent to deprive Plaintiff of use of the ESI. *See id.* (finding bad faith in part due to the defendant's "repeated obfuscation and misrepresentations" related to the emails' deletion and the defendant's investigation of the deletion).

Lastly, the timing of the deletion is instructive. Defendants deleted Plaintiff's email account on March 6, 2017, purportedly in accordance with their policy of deleting terminated employee's email accounts after "two months." (van der Bent Decl. ¶ 6). Only 38 days, however, had passed since Plaintiff's termination. At that time, Plaintiff had not returned the release of all claims arising out of her employment offered with her severance package. The timing here is suspect, at a minimum. Further, Plaintiff's SAP information was deleted after Plaintiff's Complaint had been filed, and after Defendants' counsel instituted a litigation hold, due to an unexplained "glitch." All the above, when considered together, lead the Court to conclude that the loss of the at-issue ESI was beyond the result of mere negligence.

Defendants' actions present sufficient circumstantial evidence from which to infer that they intended to deprive Plaintiff of the relevant ESI for use in litigation.

### 6.    Appropriate Sanction

Plaintiff requests, in the alternative, that the Court strike Defendants' answer and enter a default judgment; strike Defendants' affirmative defenses and issue a preclusion order; or allow the jury to be given an adverse inference instruction. Plaintiff also seeks costs and attorneys' fees.

This Court does not agree with Plaintiff that an order striking Defendants' answer or affirmative defenses is justified. "[C]ourts must be wary of issuing case-dispositive sanctions; such sanctions should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 141 (S.D.N.Y. 2009) (internal quotation omitted). Here, although Defendants' actions were "sufficiently egregious" to support a finding of intent to deprive, "they do not warrant outright disposition of the case." *Moody*, 271 F. Supp. 3d at 432. An adverse inference instruction, rather, will serve the "prophylactic and punitive rationales" for such an instruction, "deter[ring] such destruction, and [] properly plac[ing] the risk of an erroneous judgment on the party that wrongfully created the risk." *Kronisch*, 150 F.3d at 126.

Additionally, an adverse inference instruction serves the remedial function of "restoring the prejudiced party to the same position [she] would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* Defendants' destruction of Plaintiff's ESI "limited the universe of documents available for [Plaintiff] to use in this litigation." *Lokai*, 2018

WL 1512055, at *12; *see CAT3, LLC  v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. Jan.

12, 2016) ("Plaintiff's case against Defendants is weaker when it cannot present the

overwhelming quantity of evidence it otherwise would have to support its case." (quoting

*Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 533 (D. Md. 2010)). This loss is especially

damaging due to the nature of the claims in this case, which so often come down to credibility,

and where corroborating documents are critical. An adverse inference instruction

"appropriately addresses" this "evidentiary gap." *Moody*, 271 F. Supp. 3d at 432.

## IV.    Conclusion

For the foregoing reasons, I recommend that Plaintiff's request for an adverse inference

instruction be **GRANTED** but Plaintiff's request to strike Defendants' answer or affirmative

defenses be **DENIED**. A separate order will follow on Plaintiff's request for attorney's fees and

costs.

## V.    Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

fourteen (14) days (including weekends and holidays) from receipt of this Report to file written

objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A

party may respond to any objections within fourteen (14) days after being served. Any requests

for an extension of time for filing objections must be directed to Judge Gardephe.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER**

**OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** (*See Thomas v. Arn*, 474 U.S. 140,

155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v.*

*Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.

1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir. 1983)).


    Respectfully submitted,


                                          *s/ Ona T. Wang*

Dated: June 19, 2019                             **Ona T. Wang**
      New York, New York                United States Magistrate Judge