UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINE HAZEL S. CRUZ,

                                    Plaintiff,          Case No. 1:17-cv-07685 (PGG)(OTW)

        - against -

G-STAR INC., G-STAR USA LLC, and G-
STAR RAW C.V.,

                                    Defendants.

**DEFENDANTS' OBJECTIONS TO JUNE 19, 2019 REPORT AND
RECOMMENDATION ON PLAINTIFF'S SPOLIATION MOTION**

FOX HORAN & CAMERINI LLP
885 Third Avenue, 17th Floor
New York, New York 10022
Tel.: (212) 480-4800

*Attorneys for Defendants G-Star Inc.
and G-Star USA LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

RELEVANT FACTUAL BACKGROUND .......................................................................... 4

I.      PLAINTIFF'S EMPLOYMENT WITH G-STAR ................................................. 4

II.     PLAINTIFF'S JOB PERFORMANCE .................................................................. 4

III.    THE "FIRST COMPLAINT" ................................................................................ 5

IV.     THE RESOLUTION OF THE "FIRST COMPLAINT" ...................................... 7

V.      THE "SECOND COMPLAINT" ........................................................................... 7

VI.     THE TERMINATION OF PLAINTIFF'S EMPLOYMENT WITH G-STAR ................. 8

VII.    DELETION OF PLAINTIFF'S EMAIL FILE ..................................................... 8

VIII.   SUBSEQUENT CONTACTS WITH G-STAR ..................................................... 8

IX.     G-STAR'S IMMEDIATE EFFORTS TO PRESERVE EVIDENCE .............................. 9

X.      G-STAR'S RETENTION EFFORTS DURING THIS LITIGATION ............................. 9

XI.     G-STAR'S DISCLOSURE OF THE DELETIONS ......................................... 11

XII.    PLAINTIFF'S SPOLIATION MOTION ............................................................ 12

ARGUMENT ...................................................................................................................... 12

I.      STANDARD OF REVIEW ................................................................................. 12

II.     STANDARD OF LAW ........................................................................................ 13

III.    THIS COURT SHOULD REJECT THE RR AND FIND THAT G-STAR DID NOT
        ENGAGE IN ANY SANCTIONABLE SPOLIATION ...................................... 13

        A.      This Court Should Reject the RR's Recommendation that G-Star's Duty to
                Preserve Arose in October 2016, As Litigation Was Not Likely Then ............... 13

                1.      The First Complaint Did Not Trigger the Duty to Preserve Evidence ..... 14

                        (a)     As of October 2016, G-Star Had No Reason to Believe That
                                Litigation with Plaintiff was Likely ............................................. 14

                        (b)     The RR Improperly Assumes that the First Complaint Raises
                                Discrimination or Harassment ...................................................... 15

2. The Email File was Deleted Before the Duty to Preserve was Triggered .. 16

3. G-Star Properly Imposed a Litigation Hold in July 2017 ......................... 17

B. Because the Evidence Can Be Obtained from Other Sources, this Court Should Reject the RR's Recommendation that the Email File and SAP Data Cannot Be Restored ........................................................................................................... 17

1. The Email File ............................................................................................ 18

2. The Reconstruction .................................................................................... 19

3. The SAP Data ............................................................................................. 19

C. The Evidence Does Not Support the RR's Recommendation that Plaintiff Suffered Prejudice .................................................................................................. 20

D. The Evidence Does Not Support the RR's Recommendation that G-Star Acted with the Intent to Deprive Plaintiff of Evidence for Use in This Litigation ......... 22

1. G-Star's Imposition of a Litigation Hold in July 2017 Does Not Evidence Intent to Deprive ....................................................................... 22

2. Routine Deletion of the Email File Does Not Evidence Intent to Deprive ....................................................................................................... 22

3. Routine Deletion of SAP Data Does Not Evidence Intent to Deprive ..... 23

4. G-Star's Reconstruction of the Email File and Production of SAP Data Refutes the RR's Finding of Intent to Deprive ......................................... 23

5. G-Star's Conduct in this Litigation Does Not Show Intent to Deprive .... 24

E. Because the Intent to Deprive Cannot be Shown, No Adverse Inference Sanction May Be Awarded .................................................................................................... 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Bamba v. Fenton,*
    758 F. App'x 8 (2d Cir. 2018) ............................................................ 15

*Batchelor v. City of N.Y.,*
    12 F. Supp. 3d 458 (E.D.N.Y. 2014) ................................................. 16

*Best Payphones, Inc. v. City of N.Y.,*
    2016 WL 792396 (E.D.N.Y. Feb. 26, 2016) ............................... 17, 21, 23

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
    244 F.R.D. 614 (D. Colo. 2007) ........................................................ 14

*E.E.O.C. v. Bloomberg, L.P.,*
    967 F. Supp. 2d 816 (S.D.N.Y. 2013) ................................................ 14

*GN Netcom, Inc. v. Plantronics, Inc.,*
    2016 WL 3792833 (D. Del. July 12, 2016) ........................................ 24

*Goodman v. Praxair Servs., Inc.,*
    632 F. Supp. 2d 494 (D. Md. 2009) .................................................. 13

*In re Ethicon,*
    2016 WL 5869448 (S.D. W. Va. Oct. 6, 2016) ................................... 22

*IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.,*
    2008 WL 4810043 (S.D.N.Y. Nov. 3, 2008) ..................................... 12

*John Wiley & Sons, Inc. v. Book Dog Books, LLC,*
    2015 WL 5769943 (S.D.N.Y. Oct. 2, 2015) ...................................... 14

*Leidig v. Buzzfeed, Inc.,*
    2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) .................................... 22

*Lokai Holdings LLC v. Twin Tiger USA LLC,*
    2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ........................... 13, 22, 25

*Mitchell v. SUNY Upstate Med. Ctr.,*
    243 F. Supp. 3d 255 (N.D.N.Y. 2017) ............................................... 15

*Moody v. CSX Transportation, Inc.,*
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) .............................................. 24

*O'Berry v. Turner,*
    2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) .................................... 24

*Ottoson v. SMBC Leasing and Fin., Inc.*,
    268 F. Supp. 3d 570 (S.D.N.Y. 2017).................................................................. 24

*Puebla Palomo v. DeMaio*,
    2019 WL 1323927 (N.D.N.Y. Mar. 25, 2019) ..................................................... 16

*Sanders v. N.Y.C. Human Res. Admin.*,
    361 F. 3d 749 (2d Cir. 2004)............................................................................... 15

*Sank v. City Univ. of N.Y.*,
    2011 WL 5120668 (S.D.N.Y. Oct. 28, 2011) ..................................................... 14

*Sparrow Fund Mgmt., LP v. MiMedx Group, Inc.*,
    2019 WL 1434719 (S.D.N.Y. Mar. 31, 2019) (Gardephe, J.) ............................ 12

*Ungar v. City of N.Y.*,
    329 F.R.D. 8 (E.D.N.Y. 2018) ............................................................................ 25

*Zubulake v. UBS Warburg*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................ 25

**Other**

Fed. R. Civ. P. 37...................................................................................................... *passim*

Fed. R. Civ. P. 37 advisory committee note to 2015 amendment.............................. *passim*

28 U.S.C. § 636.............................................................................................................. 12

## PRELIMINARY STATEMENT

Defendants G-Star Inc. and G-Star USA LLC (collectively, "G-Star") object to Magistrate Judge Ona T. Wang's June 19, 2019 Report & Recommendation (the "RR") on the motion for spoliation sanctions by Plaintiff Christine Hazel S. Cruz ("Plaintiff"). ECF No. 89. The RR erroneously finds that G-Star acted with the intent to deprive Plaintiff of evidence and recommends that an adverse inference instruction be given at the trial of this action. *See id.*

In this employment discrimination action, Plaintiff claims that she was discriminated against because of her Asian race and female gender. *See* Matz Decl., Ex. 1.[1] Plaintiff asserts sexual harassment claims based on the following discrete incidents:

- In November 2014, being asked to dinner by a franchise partner's brother;
- In January 2015, being inadvertently copied on an email scolding a franchise partner for his focus on Plaintiff's body, rather than on business;
- In May 2016, receiving text messages from a colleague inviting Plaintiff to meet him and other colleagues for a drink following a company-wide event;
- In August 2016, at an overnight team-building trip, that same colleague telling Plaintiff – in the presence of 4 other male and female co-workers gathered in his hotel room – that she could sit on his bed so she was not standing; and
- In September 2016, a fatherly arm around the shoulders and a buss on the head by the Country Manager, who did this to both male and female employees.[2]

Plaintiff also asserts claims for alleged discriminatory hostile work environment, failure to promote, retaliation, and unpaid wages, including overtime and spread-of-hours pay. *See id.*

During discovery, G-Star produced 6,612 pages of documents requested by Plaintiff,

---

1. References to the "Matz Decl." are references to the Declaration of Sarah M. Matz, dated October 1, 2018, filed in support of Plaintiff's spoliation motion. ECF No. 45.

2. The Country Manager left his employment with G-Star in October 2016 to go to another company. Within days of her discharge in 2017, Plaintiff asked the Country Manager for a job at his new company.

including 2,541 pages of complete emails. *See* Kundar Decl., Ex. M.[3] In July 2018, counsel volunteered that G-Star's Information and Communication Technologies Team ("ICT"), following its normal routine, had deleted: (1) Plaintiff's Outlook email file, in .pst format, on March 6, 2017 (the "Email File"); and (2) Plaintiff's data from the SAP order-entry system, in December 2017.

On August 2, 2018, G-Star produced a reconstruction of the Email File – which it created on its own initiative, and at its considerable time and expense ("Reconstruction"). It contains 129,297 pages of complete emails and incomplete emails containing sufficient text to trace the message elsewhere. Thereafter, Plaintiff filed her spoliation motion. While briefing the motion, G-Star found a way to retrieve much of Plaintiff's SAP data and promptly produced it.

Despite G-Star's restoration of much of what was deleted, and despite Plaintiff's failure to seek alternate discovery from other custodians' email files, the Magistrate recommended that an adverse inference instruction be given. RR, pp.33-34. G-Star objects to the RR because the requirements of Fed. R. Civ. P. 37(e) have not been met:

- The RR's finding that G-Star's duty to preserve evidence arose in October 2016, after Plaintiff submitted her "First Complaint" to HR on September 24, 2016, is incorrect. There was no basis to conclude that litigation was likely at that time. Plaintiff did not threaten to sue, nor did any lawyer for Plaintiff contact G-Star to say that she intended to sue.

- While the First Complaint includes the words "hostile work environment," it makes no mention of actionable discrimination or harassment. Nor does it mention gender, race, or any other protected trait. As such, the First Complaint does not include "allegations of a hostile work environment" prohibited by law, as assumed in the RR. RR, p.6.

- G-Star's voluntary efforts to reconstruct the Email File and produce SAP data show that the deleted information has been largely restored. Additionally, Plaintiff's emails could have been traced and obtained from other employees' email files. It is a condition to the granting of Rule 37(e) sanctions that the information cannot be restored or replaced. The RR wrongly minimizes G-Star's efforts to restore, as well as the fact that G-Star identified alternate sources of evidence and made them available for discovery.

---

3. References to the "Kundar Decl." are references to the Declaration of Kathleen M. Kundar, dated November 2, 2018, filed in support of Plaintiff's spoliation motion. ECF No. 50.

- On the spoliation motion, Plaintiff's counsel delivered to the Magistrate a disc represented to contain the incomplete emails in the Reconstruction. Matz Decl., ¶ 36, Ex. 26. (emails "in cut off format."). G-Star was served with a copy electronically, found it to be in order, and relied on it to show the extensive content and how it would lead to replacement discovery. G-Star even cited to it in opposing Plaintiff's motion. *See* ECF No. 53 (G-Star Br.), p.16. The Magistrate, however, did not consider the disc **provided by Plaintiff** because it "**was itself corrupted and thus the Court was unable to view the disc's contents**." RR, p.18 fn.9. Rather than requesting another copy, or even alerting G-Star to what Plaintiff had delivered, the Magistrate disregarded the contents and wrongly concluded that she "could not find, on the present record, that Plaintiff's email can be replaced." RR, p.27.

- G-Star objects to the RR's finding that Plaintiff suffered prejudice. The Magistrate should have credited G-Star's creation of the Reconstruction, identification and production of alternate sources of evidence, and production of Plaintiff's SAP data, as well as Plaintiff's failure to seek the evidence from any other sources. Moreover, given that Plaintiff's deposition testimony limited her non-wage claims to discrete incidents which took place outside of email, the prejudice to Plaintiff cannot be what the RR makes it out to be.

- G-Star did not act with the intent to deprive Plaintiff of evidence for use in this litigation. The RR's listed reasons for finding an intent to deprive are not based on any direct evidence. Rather, the RR's recommendation is based on unsupported speculation and suspicion drawn from a timeline that erroneously begins in October 2016.

- The RR erroneously concludes that G-Star acted in "bad faith" based on a finding that its counsel did not disclose the deletions for a "period of over a year." RR, p.31. The RR itself shows that G-Star's counsel learned of the deletions in late March and April 2018 and disclosed them 4 months later, in July 2018, after the parties' court-directed settlement efforts (*see* ECF No. 20) failed.

- The evidence before the Magistrate included the Declaration of Rob van der Bent, ICT Manager of Support & Procurement, ECF No. 51 (the "van der Bent Decl."), who swore he oversees G-Star's email files, that he has no reason to believe the Email File was deleted to deprive Plaintiff or anyone of its use in litigation, and that the deletion was routine.

  G-Star also submitted the Declaration of Klaas Buist, ICT Manager, ECF No. 52 (the "Buist Decl."), who swore he oversees G-Star's SAP files, the December 2017 deletion of Plaintiff's SAP data occurred due to a "glitch" caused by prior deletion of the Email File, he has no reason to believe that Plaintiff's SAP data was deleted to deprive her or anyone of its use in litigation, and the deletion occurred as part of a routine clean-up of SAP files.

  The RR does not credit any of this evidence – even though the RR cites to no evidence contradicting or undermining it. The RR is therefore objectionable.

- G-Star objects to the recommendation that an adverse inference be given. G-Star did not act with the intent to deprive Plaintiff of evidence. Although the Magistrate noted that cases like this "so often come down to credibility" and "corroborating documents are critical," RR, p.34, Plaintiff has not identified a single email that she sent or received that she believes would corroborate her claims and does not already have. Moreover, the small

portion of lost SAP data relates to the hours worked by Plaintiff, and G-Star produced to Plaintiff several categories of documents reflecting Plaintiff's work hours.

For these reasons, and for the reasons that follow, G-Star respectfully requests that this Court reject the RR's recommendations, find that Fed. R. Civ. P. 37(e)'s requirements for awarding sanctions have not been met here, and decline to enter sanctions against G-Star.

## RELEVANT FACTUAL BACKGROUND

### I.   PLAINTIFF'S EMPLOYMENT WITH G-STAR

Plaintiff began employment with G-Star USA LLC as a Senior Sales Back Office ("SBO") Employee on November 1, 2012. Kundar Decl., ¶ 40(B).[4] Plaintiff was responsible for managing G-Star's SBO team, supervising order entry, and performing operational work for G-Star's franchise stores. *See id.* Effective December 1, 2015, Plaintiff was promoted to the role of Local Customer Service Manager and received a pay increase. *Id.* After her promotion, in 2016, Plaintiff was assigned the additional duty to work on G-Star's takeover of franchise stores, which was being led by Kendra Palmer – then G-Star's Retail Director ("Palmer"). *Id.*; Matz Decl. Ex. 11 at G-Star 0200. Plaintiff also continued to manage the SBO team, supervise order entry, and facilitate store operations. Kundar Decl. ¶ 40(B). Plaintiff was, at all times, an exempt employee. *See*, *e.g.*, Kundar Decl., Ex. J.

### II.   PLAINTIFF'S JOB PERFORMANCE

After her promotion, incidents of Plaintiff's poor performance began to surface. *See*, *e.g.*, Matz Decl., Exs. 12, 17; Kundar Decl. ¶ 40(C). After 10 months of uneven performance, on September 19, 2016, it was discovered that Plaintiff had also failed to ensure that an order worth $250,000 was timely entered (the "Order"). Matz Decl., Ex. 12 at G-Star 0597-605. As Plaintiff

---

4.   Following the merger of G-Star USA LLC into G-Star Inc. on December 31, 2012, Plaintiff continued in her role of Senior SBO Employee as an employee of G-Star Inc. *See id.*

had to have known, not only did this failure result in financial loss, but it also jeopardized G-Star's relationship with a major department store and stood to result in cancellation of a store event with a celebrity partner (it was cancelled). *See id.*; Matz Decl., Ex. 17 at G-Star 0614. Plaintiff's failures led to discussions in September 2016 about the possibility of discharging Plaintiff, as Plaintiff acknowledges in her pleading. Matz Decl., Ex. 44; *see also* Matz Decl., Ex. 1 at ¶¶ 80, 81.

On September 19 or 20, 2016, Palmer spoke with Abiy Paulos ("Paulos") – then a Senior Account Manager – about Plaintiff's job performance, and he shared text messages with a former G-Star franchise partner indicating Palmer wanted to discharge Plaintiff. Matz Decl. Ex. 1 at ¶ 80. That franchise partner showed Paulos's text messages to Plaintiff on September 20 and 23, 2016. *See id.* at ¶ 81.

## III.  THE "FIRST COMPLAINT"

In a classic application of "the best defense is a good offense," on September 24, 2016, Plaintiff sent a "Formal Complaint" to Willemien Storm ("Storm") – the global Chief HR Officer – complaining of "overwork" and a "conspiracy" to terminate her (the "First Complaint"):

> I am writing this email as a formal complaint, advising G-Star how Kendra Palmer is fostering a hostile work environment. How I am being unfairly treated. How I am intentionally being overworked. How I am being forced to carry other people's responsibility.
>
> And lastly, I am advising you of a conspiracy to unlawfully fire me for undo [sic] cause.
>
> I am kindly asking you to intervene to ensure a fair work environment and to undo the animosity and low moral [sic] that is currently in place in our office.
>
> I have complained numerous times of how I am overworked. How more and more responsibility is added to my plate. I can only do so much an a [sic] 8 hour day. And because it isn't in me to leave a lot of things incomplete, I find myself working well over 40 hours per week. In addition to my back office and shipping functions, I have been asked to take on an active role in the stores such as training staff, addressing retail staff concerns, buying supplies, dealing with vendor issues, and addressing maintenance issues at our retail stores. Our head of retail, Kendra Palmer, doesn't lift a finger to do her responsibility. All she does is delegate all her responsibilities to me to perform them. And this is on top of my regular 8 hour workload on my desk. I have been forced to not only neglect my primary

responsibilities but also my family to work in excess of 12 hours per day on multiple occasions.

I am requesting that you do some due diligence, which would substantiate what I am saying to you. I challenge you to call any of our past franchise partners, our current franchise partners, or any of our current retail employees to get feedback on [Palmer's] performance and how she doesn't perform her responsibilities. They will also substantiate to you who it is that addresses all their concerns.

Because of [Palmer's] lack of work, I am being overworked and I can't keep up. Rather than anyone fixing this, rather than the CM address these issues, I am told – 'Don't worry, Work hard and you will be taken care of.'

I have worked on weekends, on holidays, and late evenings just to ensure the success of this firm and this is the gratification I get – a conspiracy to fire me because [Palmer] has overloaded my plate so much that I can't humanely keep up.

I am saddened by the fact that my concerns have been overlooked. This is why I decided to bring a formal complaint to Human Resources [sic] attention as senior management in the US office has ignored all my complaints. I am hopeful you will address this without any further action from my part.

Matz Decl., Ex. 8. At no point in her First Complaint did Plaintiff complain about sexual harassment or gender or racial discrimination. *Id*. Plaintiff never even used the words "harassment" or "discrimination." *Id.* Nor did she complain about non-payment of wages. *Id.* As the text shows, the phrase "hostile work environment" refers to workload, not discrimination or harassment. *Id.*

Plaintiff was given numerous opportunities to address her concerns during a phone call with Storm on October 5, 2016, in follow-up emails with Storm (which have been produced), and at an in-person meeting to address the First Complaint on October 13, 2016. *See*, *e.g.*, Matz Decl, Ex. 11. Storm even specifically asked Plaintiff if there was "anything else" she wanted to address. *See id*. at G-Star 0201. Plaintiff continued to complain about her workload – and made no mention of sexual harassment, nor discrimination based on any protected trait, nor any request for unpaid wages. *See*, *e.g.*, *id*. Moreover, although Plaintiff referred to a lawyer in her follow-up communications with Storm, she never identified any lawyer and no lawyer surfaced during the investigation. *Id*. at 0201-0202.

## IV.   THE RESOLUTION OF THE "FIRST COMPLAINT"

To address Plaintiff's concerns of overwork, G-Star decided that Plaintiff's job title and salary would remain the same, but her workload would be reduced. Kundar Decl., ¶ 40(D). Plaintiff did not object to this and, about two weeks later, acknowledged to Storm that conditions had "improved somewhat," *see* Kundar Decl., Ex. C at 182.

## V.   THE "SECOND COMPLAINT"

Even after Plaintiff's workload was reduced, her job performance did not improve. Plaintiff often failed to communicate when needed and was insubordinate toward Palmer, particularly when it came time to complete performance evaluations for the SBO team in December 2016. Kundar Decl., ¶ 40(E). Due to a mix-up over the distribution of the evaluation forms, Plaintiff did not receive them. *Id.* This was not discovered until the day they were due. *Id.* On that date, Plaintiff was out of the office on a personal day. *Id.* Palmer did not interfere with Plaintiff's personal time and completed the evaluations, based on feedback from pertinent people. *See* Matz Decl., Ex. 13.

Although Plaintiff knew it was G-Star's practice for year-end evaluations to be completed in December, having done them in prior years, Plaintiff did not even inquire about the evaluations until January 6, 2017. *See id*. On that date, Plaintiff learned that Palmer had taken care of them. *Id.* In response, Plaintiff was rudely demanding and insubordinate toward Palmer – who by then was co-manager of the whole company. *See id.* Once again going on the offense to defend against her own performance failing, Plaintiff sent another "Formal Complaint" to Storm (the "Second Complaint"). *See id.* In the Second Complaint, Plaintiff complained about Palmer's completion of the evaluations. *See id.* Again, Plaintiff did not mention her Asian race, her female gender, sexual harassment, or any other words indicating a complaint of any matters employees often take to court. *See id.* Plaintiff also said nothing about her wages. *See id.*

7

## VI.     THE TERMINATION OF PLAINTIFF'S EMPLOYMENT WITH G-STAR

Based on her insubordination and other job performance issues since her workload was reduced, and mindful of her earlier performance issues, G-Star ultimately terminated Plaintiff's employment on January 27, 2017. *See* Matz Decl., Ex. 14.[5] At that time, G-Star issued a written Termination Memo to Plaintiff which listed "Insubordination," "Ineffective or lack of communication," and "Unprofessional manner" as the reasons for her termination. Matz Decl., Ex. 14. G-Star also offered a proposed agreement and release to Plaintiff, as is its usual practice when an employee is terminated.  *See id.*

## VII.    DELETION OF PLAINTIFF'S EMAIL FILE

On January 27, 2017 – the last day of her employment with G-Star – Plaintiff's Email File was shut down (locked) per G-Star's standard practices, as administered from Amsterdam. van der Bent Decl. ¶ 5. On March 6, 2017, ICT in Amsterdam noticed that Plaintiff's Windows account, including the Email File, had not yet been deleted. *Id.* ¶ 6. As there was no hold on the account, on March 6, 2017, ICT deleted Plaintiff's account per G-Star's standard practice of doing so approximately 2 months following the termination of employment. *See id.* ¶¶ 6, 9.

## VIII.   SUBSEQUENT CONTACTS WITH G-STAR

At the end of March 2017, Gary Adelman, Esq., left a voicemail for Storm. Kundar Decl., ¶ 12. Storm informed G-Star's counsel, Kathleen M. Kundar, Esq., who returned Mr. Adelman's call on Monday, April 3, 2017. *Id.* ¶ 13. Mr. Adelman said he represented Plaintiff and was "retained to look into" hostile work environment, sexual harassment, and FLSA claims. *Id.* He gave no additional information. *Id.* Mr. Adelman told Ms. Kundar he would send her a letter with

---

5.   The RR erroneously states that Plaintiff's employment was terminated on January 26, 2017, not January 27, 2017. *See* RR, pp. 5, 9.

specifics, but no letter was sent until July 20, 2017 – nearly *4 months* after they spoke on April 3, 2017. *See* Kundar Decl., Ex. H. During that 4-month period, neither Ms. Kundar nor G-Star had any contact with Mr. Adelman or anyone else purporting to represent Plaintiff. Kundar Decl. ¶ 14.

## IX.   G-STAR'S IMMEDIATE EFFORTS TO PRESERVE EVIDENCE

Promptly after receiving the July 20, 2017 letter, in-house counsel for G-Star instituted a litigation hold upon "various email accounts," including Plaintiff's. van der Bent Decl. ¶ 7. In late July 2017, Ms. Kundar also spoke to in-house counsel about the need to preserve evidence for use in potential litigation. Kundar Decl. ¶ 15. On July 25, 2017, Ms. Kundar emailed HR an initial list of documents to assemble for use in potential litigation. *Id.*

## X.   G-STAR'S RETENTION EFFORTS DURING THIS LITIGATION

Plaintiff filed this action on September 1, 2017, asserting claims under the FLSA, the NYLL, the NYSHRL, and the NYCHRL. Matz. Decl., Ex. 1. On October 2, 2017, Ms. Kundar emailed G-Star's in-house counsel and HR another list of documents to assemble and emphasized that "[w]e eventually will have to p[roduce] many emails from the years of [Plaintiff's] edmployment [sic]. I will work on a list of reasonable search terms." Kundar Decl., ¶ 18.

On March 8, 2018, Plaintiff served her first set of document demands, seeking certain categories of emails, a "table-style printout" of the Email File, and SAP data. Matz Decl., Ex. 18. In-house counsel directed ICT to "search for various emails relating to G-Star Inc. and [Plaintiff]" and reiterated his instruction "not to delete the account for [Plaintiff] and files attached to that account." van der Bent Decl. ¶ 8. At that time, it was found that the Email File had been deleted on "03/06/2017," per G-Star's standard practices. *Id.* ¶¶ 6, 8. It was also found that Plaintiff's SAP data was deleted in December 2017; the prior deletion of the Email File "caused a glitch in the hold process: as a consequence, the people performing the deletion of SAP, were not informed of any hold." Buist Decl. ¶ 7. The SAP data was deleted "during [a] periodic clean-up of SAP

9

accounts," and Plaintiff's account was not specifically targeted. *Id.*

Upon discovering the deletion of the Email File, G-Star, on its own initiative, took immediate steps to prepare the Reconstruction using archived records. van der Bent Decl. ¶ 11. This process took two employees – working full-time – nearly five full business days to complete. *Id.* G-Star was ultimately able to reconstruct the Email File, in .pst format. *Id.* Each email in the Reconstruction reflects: (1) "who was the sender, receiver and copy readers"; (2) "the date and time the messages were sent"; and (3) "a few lines of text" in the body of the message. *Id.* G-Star produced the Reconstruction to Plaintiff on August 9, 2018. Kundar Decl. ¶ 36. Ms. Kundar also worked with in-house counsel to identify other employees whose email files would contain messages to or from Plaintiff, or would have Plaintiff as a copy reader. *Id.* ¶ 25.

As a result of G-Star's continued searches, in late October 2018, a technical data specialist was able to locate Plaintiff's SAP data from 2014-2017. Buist Decl. ¶ 10.[6] G-Star promptly produced this data to Plaintiff on October 30, 2018. Kundar Decl. ¶ 37.

Throughout discovery, in addition to the Reconstruction and Plaintiff's SAP data, G-Star produced other sources of evidence as to Plaintiff's work hours, including: (1) more than 1,000 pages of Plaintiff's daily computer log-in records for the 2 desktop computers that Plaintiff used while employed by G-Star; (2) weekly attendance sheets reflecting Plaintiff's days in and out of the office, including for work-related travel; (3) a list of Plaintiff's absences from work; and (4) copies of work schedules requiring that Plaintiff perform work outside of normal business hours

---

6.  It is likely that no entries were created by Plaintiff during her first year of employment (November 2012 – December 2013). A search was performed for all SAP data concerning Plaintiff from 2012 through January 27, 2017. *Id.* ¶ 10. No data as to Plaintiff was found in 2012 or 2013. *Id.* ¶ 11. However, there were orders entered by Jouvonda Weeks, an SBO employee Plaintiff supervised, during that time. *Id.* Per Claudia van Hunnik, who managed SBO globally in 2012 and 2013, "entering orders in SAP was not the primary task of [Plaintiff] and [] other members of her team would do this – like Jouvonda Weeks." *Id.*

on specified dates in 2016. Kundar Decl., ¶ 39. The depositions of 12 witnesses over 16 days also

yielded substantial evidence as to Plaintiff's working hours and job responsibilities.

## XI.    G-STAR'S DISCLOSURE OF THE DELETIONS

The first document demands in this case were served on March 8, 2018. In late March

2018, in-house counsel reported to Ms. Kundar that he had just learned that the Email File had

been deleted. *Id.* ¶ 24. In April 2018, Ms. Kundar first learned that Plaintiff's SAP data had been

deleted in December 2017. *Id.* ¶ 26. Ms. Kundar did not immediately disclose the deletions to

Plaintiff's counsel because she was awaiting more information as to the deletions and was working

with in-house counsel to identify other sources of the evidence. *Id.* ¶ 27. Ms. Kundar was also

speaking with an e-discovery consultant to assist with reviewing other G-Star employees' .pst

email files so that from them G-Star could produce complete versions of emails in Plaintiff's Email

File. *Id.* Additionally, Ms. Kundar deferred disclosing the deletions because the parties both stated

an interest in settlement to this Court at the status conference held on May 3, 2018, and this Court

then ordered that this action be referred to the Magistrate for settlement discussions. *Id.* ¶ 30.

On June 27, 2018, the parties participated in an all-day mediation and were unable to settle.

*Id.* ¶ 31. As July 2018 proceeded, with the assistance of an e-discovery consultant, Ms. Kundar

believed that remaining discovery could be accomplished by obtaining Plaintiff's emails from

other G-Star employees' .pst email files. *Id.* ¶ 33. Those files were delivered to the e-discovery

consultant. Mevorah Decl. ¶ 4.

On July 26, 2018, Ms. Kundar disclosed the deletions of the Email File and Plaintiff's SAP

data to Plaintiff's counsel. Kundar Decl. ¶ 34.

On August 2, 2018, the parties appeared before Magistrate Wang for a hearing on the

parties' discovery disputes. *Id.* ¶ 36. Although Ms. Kundar made clear that other employees' email

files could be searched, Plaintiff's counsel informed the Magistrate that they would take the

11

Reconstruction – even knowing that it was not complete – and did not want to pursue discovery from the other employees' email files using search terms. Kundar Decl., Ex. K at p.8 ("COURT: My understanding is from reading the materials is that plaintiffs are now just saying forget the search terms, you don't have to incur that cost, just turn over the PST file? … MR. ADELMAN: Yes. MS. MATZ: For the most part, yes."); *see also* Kundar Decl., ¶ 36.

## XII.   PLAINTIFF'S SPOLIATION MOTION

In the fall of 2018, the parties briefed Plaintiff's motion for spoliation sanctions against G-Star. On June 19, 2019, Magistrate Wang issued the RR. The RR recommends that an adverse inference instruction be given on the basis of the erroneous finding that G-Star acted with the intent to deprive Plaintiff of evidence for use in this litigation. ECF No. 89. As shown below, the RR is objectionable for this and other reasons and should be rejected by this Court.

<u>**ARGUMENT**</u>

## I.   STANDARD OF REVIEW

Within 14 days of being served with a copy of a magistrate judge's report and recommendation, "any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C. § 636(b)(1)(C). "Objections ... must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008).

"A district court must review <u>de novo</u> 'those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Sparrow Fund Mgmt., LP v. MiMedx Group, Inc.*, 2019 WL 1434719, at *5 (S.D.N.Y. Mar. 31, 2019) (Gardephe, J.) (quoting 28 U.S.C. § 636(b)(1)) (emphasis in original). "This Court 'may accept, reject, or modify in whole or in part' findings or recommendations issued by a magistrate judge." *Id.* (quoting 28 U.S.C. § 636(b)(1)). A judge reviewing a magistrate's report and recommendation "may also receive further evidence

or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## II.   STANDARD OF LAW

Fed. R. Civ. P. 37(e),[7] amended as of December 1, 2015, governs Plaintiff's spoliation motion. Before discovery sanctions can be entered, Rule 37(e) "require[s], at a minimum, that the court find prejudice, and, in order to impose more extreme sanctions, that it find an intent to deprive." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018). "[G]iven the severity of the sanctions available under Rule 37(e)(2)," some courts have found that "the requisite intent finding should be based on clear and convincing evidence[.]" *Id.* at *1 (circumstantial evidence "suggestive of an intent to deprive" was "not sufficiently compelling to justify the necessary finding").

## III.   BECAUSE THE REQUIREMENTS OF RULE 37(e) ARE NOT MET HERE, THIS COURT SHOULD REJECT THE RR AND FIND THAT G-STAR DID NOT ENGAGE IN ANY SANCTIONABLE SPOLIATION

### A.   This Court Should Reject the RR's Recommendation that G-Star's Duty to Preserve Arose in October 2016, As Litigation Was Not Likely Then

In applying Rule 37(e), "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37 advisory committee note to 2015 amendment. "The mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation or that the duty to preserve arises." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 510 (D. Md. 2009); *see, e.g., John Wiley & Sons, Inc. v.*

---

7. Rule 37(e) states: "(e) If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because the party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from the loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e).

*Book Dog Books, LLC*, 2015 WL 5769943, at *8-9 (S.D.N.Y. Oct. 2, 2015) (cease-and-desist letter that did not give "specifics as to the particular claim that will be made" did not trigger duty to preserve); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007) (duty to preserve did not arise while parties were exploring resolution of concerns at issue).

### 1.    The First Complaint Did Not Trigger the Duty to Preserve Evidence

#### (a)    As of October 2016, G-Star Had No Reason to Believe That Litigation with Plaintiff was Likely

The RR incorrectly found that G-Star's duty to preserve was triggered in October 2016, after Plaintiff submitted the First Complaint. RR, pp.22-23. G-Star had no reason to conclude that litigation was likely at that time. The First Complaint did not mention any actionable harassment or discrimination or request any additional wages. *See* Matz Decl., Ex. 8. Rather, the First Complaint focused on Plaintiff's claim of overwork due to "[Palmer's] lack of work," "unfair treatment," and that Palmer did not "lift a finger to do her responsibility." *Id.*; *see E.E.O.C. v. Bloomberg, L.P.*, 967 F. Supp. 2d 816, 894 (S.D.N.Y. 2013) ("[T]he law does not mandate work-life balance."); *Sank v. City Univ. of N.Y.*, 2011 WL 5120668, at *9-10 (S.D.N.Y. Oct. 28, 2011) (complaint "about general perceived unfairness" alleged mere "[u]nfair treatment" which, without more, "is not actionable under the civil rights laws"). Even after Storm asked Plaintiff if there was "anything else" that she wanted to address, Plaintiff did not state that she was being harassed or discriminated against on the basis of any protected trait, or that she should receive overtime or other additional pay. *See*, *e.g.*, Matz Decl., Ex. 11.

Moreover, instead of suing G-Star, or even threatening litigation, Plaintiff actively participated in G-Star's efforts to internally resolve the First Complaint. G-Star took good faith steps to resolve the First Complaint by reducing Plaintiff's job duties, but not changing her job

title and salary.**8** While G-Star did consider terminating Plaintiff's employment in September and

October 2016 – after Plaintiff failed to ensure the timely entry of the $250,000 Order – it did not

do so and instead gave Plaintiff a chance to improve her job performance. *See* ECF No. 58, Ex.

44.

Although Plaintiff made mention of a lawyer at the time of the First Complaint, Plaintiff

never identified any lawyer and no lawyer ever surfaced during the parties' internal efforts to

resolve the matter. That G-Star contacted Ms. Kundar to discuss the First Complaint after it was

received also amounts to nothing more than sensibly seeking advice. It cannot be that anytime any

employee complains to an employer – regardless of whether any actionable conduct is asserted,

and regardless of whether the employer consults with counsel – the employer must immediately

expect litigation to be likely and impose a litigation hold. Here, the First Complaint did not indicate

that litigation was likely and thus did not trigger a duty to preserve evidence.

> **(b)    The RR Incorrectly Assumes that the First Complaint Raises Discrimination or Harassment**

The RR states that the First Complaint "included allegations of a hostile work environment,

in which Plaintiff was being 'unfairly treated' and 'overworked,'" R.R., p.6 – as if this

unquestionably amounted to an obvious claim for litigation. Although Plaintiff included the words

"hostile work environment" in the First Complaint, she did not state that she was being harassed

or discriminated against based on her Asian race, female gender, or any other protected trait. Matz

Decl., Ex. 8. The First Complaint cannot fairly be read as asserting any such claims. *See Bamba v.*

---

8. The reduction in Plaintiff's work responsibilities does not amount to an adverse action. *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) ("To be materially adverse, a change in working conditions must be more disruptive than … an alteration of job responsibilities."); *Mitchell v. SUNY Upstate Med. Ctr.*, 243 F. Supp. 3d 255, 278 (N.D.N.Y. 2017) (finding no adverse action where plaintiff's job responsibilities were altered, but job title and pay grade stayed the same).

*Fenton*, 758 F. App'x 8, 13 (2d Cir. 2018) (employer "could not have reasonably known" that plaintiff's internal complaint "alleged racial discrimination" based on "conclusory allegations" that plaintiff was "discriminated and defamed" and that employer engaged in "overt sabotage and discrimination"); *Batchelor v. City of N.Y.*, 12 F. Supp. 3d 458, 483 (E.D.N.Y. 2014) (including words "hostile work environment" was not enough for employer to understand internal complaint as "objection[] to discriminatory conduct"). Here too, as a matter of law, the language in the First Complaint is not enough to be understood as a discrimination claim. The RR's assumption that it was must be rejected.

### 2.   The Email File was Deleted Before the Duty to Preserve was Triggered

The R&R acknowledges that the Email File was deleted by ICT on March 6, 2017. RR, p.10. The deletion occurred before the 45-day period for Plaintiff to return her release to G-Star had expired. *See* Matz Decl., Ex. 14; *see also Puebla Palomo v. DeMaio*, 2019 WL 1323927, at *4 (N.D.N.Y. Mar. 25, 2019) (employer's "request that Plaintiff sign an employment separation agreement does not amount to contemplated or threatened litigation which would trigger" duty to preserve).[9] It was not until the end of March 2017 that a lawyer for Plaintiff reached out to G-Star to say that Plaintiff had retained him to "look into" her claims. Kundar Decl., ¶ 13. Palmer – as G-Star's Rule 30(b)(6) witness – testified at deposition that G-Star did not learn that Plaintiff planned to sue until late March or early April 2017. *See* Kundar Decl., Ex. D at pp. 21-24. Thus, the duty to preserve was not triggered until *after* the deletion.

---

9.   There is no evidence in the record that anyone in ICT even knew that a proposed release was given to Plaintiff, or that she had voiced work concerns. To the contrary, there is evidence in the record that the Email File was not deleted to deprive Plaintiff or anyone of evidence for use in litigation. *See* van der Bent Decl., ¶ 16.

### 3.    G-Star Properly Imposed a Litigation Hold in July 2017

After nearly 4 months of radio silence, on July 20, 2017, Plaintiff's counsel sent Ms. Kundar a letter describing Plaintiff's claims. Kundar Decl., Ex. H. This was the first time Plaintiff provided any specifics or indicated that she truly intended to sue. Kundar Decl., ¶ 14.

Within days of receiving the demand letter, G-Star's in-house counsel imposed a litigation hold upon "various email accounts," including Plaintiff's. van der Bent Decl. ¶ 7.[10] Ms. Kundar also advised in-house counsel of the need to preserve evidence. Kundar Decl., ¶ 15. On July 25, 2017, Ms. Kundar sent G-Star an initial list of documents to assemble for use in this action. *Id.* Just one month after Plaintiff filed suit, on October 2, 2017, Ms. Kundar sent G-Star another list of documents to assemble and emphasized that "[w]e eventually will have to p[roduce] many emails from the years of [Plaintiff's] edmployment[sic]." *Id.* ¶ 18. Contra the RR, G-Star took reasonable steps to preserve evidence and should not be sanctioned for its preservation efforts.[11]

### B.    Because the Evidence Can Be Obtained from Other Sources, this Court Should Reject the RR's Recommendation that the Email File and SAP Data Cannot Be Restored

It is a prerequisite to the granting of Rule 37(e) sanctions that evidence "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Because ESI "often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37 advisory committee note to 2015 amendment; *see*, *e.g.*,

---

10. At the time the litigation hold was imposed, in-house counsel had not been informed that the Email File had already been deleted on March 6, 2017. van der Bent Decl., ¶ 7.

11. Counsel did not know Plaintiff believed SAP data to be relevant to her overtime claim. SAP was not referenced in the demand letter (Kundar Decl., Ex. H) or in the Complaint in this action (Matz Decl., Ex. 1). *See* Fed. R. Civ. P. 37 advisory committee note to 2015 amendment (in evaluating whether party was on notice that evidence would be relevant, "[i]t is important not to be blinded to th[e] reality" that "the scope of information that should be preserved may remain uncertain" by "hindsight arising from familiarity with an action as it is actually filed").

*Best Payphones, Inc. v. City of N.Y.*, 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) (finding that "many of the documents that Defendants seek – such as [emails] – could have been requested from third parties" and that this "would have cured any violation under Rule 37(e)").

### 1. The Email File

Without citing to any evidence, or accounting for evidence showing otherwise, the RR found that the Email File could not be restored or replaced through additional discovery because it would be "nearly impossible" to obtain the emails from third parties. RR, p.26. However, Plaintiff made *no attempt* to obtain any of her emails from alternate sources – even after G-Star informed Plaintiff that it had available other employees' email files for that very purpose. Plaintiff affirmatively rejected such discovery in favor of receiving the Reconstruction – knowing it was not complete. Kundar Decl., Ex. K, at pp. 7-8. Given this rejection, there is nothing but speculation to support the RR's finding that restoring or replacing this evidence would be "nearly impossible."

Moreover, in the course of discovery, G-Star *and Plaintiff* produced 2,664 pages of complete emails sent and received by Plaintiff during her employment with G-Star. Kundar Decl., Exs. L, M. This includes emails sent in January 2017, which Plaintiff argued is a month of totally lost evidence. *See id.* Some emails were even submitted with Plaintiff's own motion papers. *See* Matz Decl., Exs. 5-8, 11, 13, 29; ECF No. 58, Ex. 41. That these emails were produced by both parties undercuts the RR's finding that Plaintiff's emails could not be restored or replaced from other sources.

In addition, as the RR seems to acknowledge, Plaintiff never served a document demand seeking production of the entire Email File. *See* RR, p.15. Rather, Plaintiff requested a "table-style printout of Plaintiff's sent and received email[s]." *Id.* The Reconstruction shows *more* than what would have been shown in a "table-style printout" of Plaintiff's emails. Unlike a table-style printout, the Reconstruction includes some or all of the content of the emails – providing additional

information to Plaintiff as to what was addressed therein. van der Bent Decl. ¶ 11. Only in the summer of 2018 did Plaintiff's request for a "table-style printout" somehow morph into a request for her entire Email File. Plaintiff's belated broadening of her request cannot discount that G-Star *has* provided the information sought by Plaintiff in her document demands – and then some.

### 2.    The Reconstruction

In support of her motion, **Plaintiff**, unbeknownst to G-Star, provided the Magistrate with a corrupted disc which purported to contain many of the emails from the Reconstruction. *See* ECF No. 48; RR, p.18 fn.9.**[12]**   The RR was the first time that G-Star learned of this. Mevorah Decl. ¶ 10. Rather than requesting another copy of the disc, or even alerting G-Star, the Magistrate instead disregarded this evidence and concluded that she "could not find, on the present record, that Plaintiff's email can be replaced." RR, p.27. The copies of the incomplete emails that should have been available on the disc are the best evidence of their extensive content and how they could lead to replacement discovery. The RR's disregard of this evidence *alone* warrants rejection of the RR.   With these objections, G-Star is providing to this Court a thumb drive containing the Reconstruction so that this Court can spot check or review as it wishes.  Mevorah Decl. ¶ 11.

### 3.    The SAP Data

G-Star produced logs of order entries by Plaintiff from 2014-2017. *See* Buist Decl., ¶¶ 10, 11. Although G-Star searched for entries from 2012 and 2013, none were found. *Id.* ¶ 11. The RR incorrectly concludes that this indicates an inability to restore the data, RR, pp.27-28 – without considering that the data might never have existed, as suggested by ICT, *see* Buist Decl., ¶ 11.

As to SAP data reflecting Plaintiff's log-in times and running of reports, the RR improperly

---

12. Plaintiff served the emails upon G-Star digitally. Thus, G-Star had no reason to know that the disc the Magistrate received from Plaintiff had been corrupted. *See* ECF No. 48.

fails to credit G-Star's explanation that restoring Plaintiff's data would immediately affect all of G-Star's systems and disrupt customers' orders and the merchandise production cycle. *See id.* ¶ 9. Particularly given the wealth of evidence G-Star has already produced to Plaintiff as to her work hours (*see* pp. 10-11 *above*), G-Star cannot be expected to harm its business to retrieve complete SAP reports so that Plaintiff has yet another source of the times she performed work. *See* Fed. R. Civ. P. 37 advisory committee note to 2015 amendment ("[S]ubstantial measures should not be employed to restore or replace information that is marginally relevant or duplicative."). Moreover, G-Star was able to produce a great deal of the SAP data requested by Plaintiff.  Buist Decl., ¶ 10. The RR's apparent failure to consider Mr. Buist's explanation is objectionable and warrants reversal.

### C.     The Evidence Does Not Support the RR's Recommendation that Plaintiff Suffered Prejudice

Based on the correct conclusions that G-Star's duty to preserve the Email File did not arise until after it had been deleted (*see* Section III A. 2. *above*), and that G-Star was not required to seriously interfere with its current SAP operations to retrieve data as to Plaintiff's SAP log-ins and SAP reports (*see* Section III. B. 3. *above*), the threshold criteria for entering Rule 37(e) sanctions have not been met and there is no basis for even *considering* whether Plaintiff was prejudiced.

However, if prejudice must be considered, this Court must evaluate the deleted "information's importance in the litigation." Fed. R. Civ. P. 37 advisory committee note to 2015 amendment. As to Plaintiff's wage claims, it must be recognized that G-Star produced substantial documentary evidence of the hours worked by Plaintiff. *See* pp. 10-11 *above*. The depositions of 12 witnesses provided additional evidence of Plaintiff's working hours and job responsibilities. The RR incorrectly failed to credit G-Star for producing this evidence to Plaintiff.

The RR's statement that Plaintiff needs her complete emails to prove "her human rights law claims, specifically to show, among other things, the quality of her work, interactions with clients and co-workers, treatment by supervisors, interest in promotions, disparate treatment, and retaliatory acts," is also incorrect. RR, pp.28-29. Plaintiff's own deposition testimony limited her claims to discrete events which, in all but one instance, took place outside of email.[13] Plaintiff also does not claim to have ever requested a promotion via email. Again, Plaintiff has not identified a single email that she believes would corroborate or establish her claims.

Moreover, G-Star offered to word search the email files of key employees who supervised or worked closely with Plaintiff during her employment with G-Star – including those mentioned in the Complaint.[14] Plaintiff rejected G-Star's offer of this discovery in favor of receiving the Reconstruction – even knowing that her Email File was not completely restored. Kundar Decl., Ex. K.[15] Plaintiff also never requested any specific person's email file. **Plaintiff's** "decision not to pursue obvious … discovery leads is not a reason to grant the serious spoliation sanctions requested." *Best Payphones, Inc.*, 2016 WL 792396, at *5 (denying spoliation motion where "many of the documents that [movants] seek … could have been requested from third parties, but

13. This email is a scolding by the Country Manager to a franchise partner to focus on business rather than on other things, such as Plaintiff's "ass." *See* Matz Decl., Ex. 6. It is not a "discussion" of Plaintiff's "ass," as inaccurately argued by Plaintiff, or an email "to another of Plaintiff's supervisors commenting on Plaintiff's 'ass,'" as stated at R&R, p.5. *Id.*

14. G-Star was ready to apply search terms to the email files of the following custodians: (1) Storm; (2) Palmer; (3) the Country Manager; (4) Paulos; (5) Juan Garcia, who co-managed G-Star with Palmer after the Country Manager left G-Star in October 2016; (6) Claudia van Hunnik, who supervised Plaintiff from her hiring on November 1, 2012 through her promotion on December 1, 2015; (7) Jouvonda Weeks, an SBO employee managed by Plaintiff for the duration of Plaintiff's employment with G-Star; and (8) Fanny Smits, who worked in HR with Storm and communicated with Plaintiff as to HR-related matters. *See* Mevorah Decl. ¶ 4.

15. The RR notes that G-Star did not identify the custodians whose email files were available. RR, p.18 fn.10. Neither Plaintiff nor the Magistrate ever asked for their names. In any event, it was clear that the custodians were other employees whose email files were in G-Star's possession.

were not" and finding that "[a]lthough this might have significantly increased [movants']

discovery burdens, [they] cannot properly complain that the documents … are not available when

[they] have not shown that they sought these documents from non-parties").

>   **D.    The Evidence Does Not Support the RR's Recommendation that G-Star Acted with the Intent to Deprive Plaintiff of Evidence for Use in This Litigation**

As demonstrated above, the threshold criteria for entering Rule 37(e) sanctions have not

been met here. As such, there is no basis for even *considering* whether G-Star acted with the intent

to deprive. However, should this Court determine to evaluate the availability of Rule 37(e)(2)

sanctions, "the intent contemplated by Rule 37 is not merely the intent to perform an act that

destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig v. Buzzfeed,

Inc.*, 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017); *see*, *e.g.*, *In re Ethicon*, 2016 WL

5869448, at *4 (S.D. W. Va. Oct. 6, 2016) (finding no intent to deprive where plaintiff did not

offer any "evidence that demonstrates that Ethicon or its employees specifically set out to deny

her access to the information"). The RR incorrectly found – without any specific proof – that G-

Star acted with intent to deprive Plaintiff of evidence for use in this litigation.

>   **1.    G-Star's Imposition of a Litigation Hold in July 2017 Does Not Evidence Intent to Deprive**

Based on the finding that the duty to preserve was triggered in October 2016, the Magistrate

makes hay of the fact that G-Star did not impose a litigation hold until July 2017. RR, pp.29-31.

However, the duty to preserve did not attach in October 2016. *See* Section III. A. 1. *above*. The

deletion of the Email File occurred before the duty to preserve was triggered. *See* Section III. A. 2.

*above*. Accordingly, to the extent that intent to deprive was found based on a timeline beginning

in October 2016, this Court must reject the RR.

>   **2.    Routine Deletion of the Email File Does Not Evidence Intent to Deprive**

Plaintiff's Email Account was deleted on March 6, 2017, in accordance with G-Star's

standard practices. *See* van der Bent Decl. ¶¶ 6, 16. The RR's statement that the timing of the deletion was "suspect, at a minimum," *see* RR, p.32, does not rise to the level of clear and convincing evidence of intent to deprive. *See Lokai*, 2018 WL 1512055, at *16 (refusing to find "intent to deprive on the basis of suspicion alone" because "the evidence, as it stands, [did] not clearly and convincingly show that Defendants sought out emails that could disadvantage them in this case, and then chose those particular emails to delete, for the purpose of keeping them out of [plaintiff's] hands") Moreover, the RR completely disregards the evidence to the contrary. *See generally* van der Bent Decl.  The RR should thus be rejected.

### 3.    Routine Deletion of SAP Data Does Not Evidence Intent to Deprive

The RR states that Plaintiff's SAP data was deleted "due to an unexplained 'glitch.'" RR, p.32. However, this "glitch" *was* explained by Mr. Buist – the ICT manager in Amsterdam who maintains SAP data. Buist Decl., ¶ 7 (because the Email File "had been deleted much earlier," the "people performing the deletion of SAP, were not informed of any hold" and consequently deleted Plaintiff's SAP data "during the periodic clean-up of SAP accounts"). Mr. Buist (who was able to retrieve most of the SAP data) swore he has "no reason to believe that anyone intentionally and willfully deleted the SAP data for [Plaintiff] in order to deprive her or anyone of the information's use in litigation." *Id.* ¶ 12. The RR's failure to credit any of this evidence warrants rejection.

### 4.    G-Star's Reconstruction of the Email File and Production of SAP Data Refutes the RR's Finding of Intent to Deprive

Upon discovering the deletion of the Email File, G-Star immediately took steps to reconstruct it and produced the Reconstruction to Plaintiff. van der Bent Decl., ¶ 11; Kundar Decl., ¶ 37. G-Star also performed additional searches of its SAP data, located a great deal of evidence, and produced what it found. Buist Decl., ¶ 10; Kundar Decl., ¶ 37. These efforts undercut any finding of intent to deprive. If G-Star truly intended to deprive Plaintiff of evidence, why would it

have *sua sponte* taken steps to create the Reconstruction *expressly for use in connection with this litigation*? *See Best Payphones, Inc.*, 2016 WL 792396, at \*5 (where plaintiff produced evidence alleged to have been destroyed in response to defendants' spoliation motion, plaintiff "did not act willfully or grossly negligently in failing to produce" the evidence). Due to its failure to credit G-Star's efforts to mitigate the loss, the RR should be rejected.

### 5.   G-Star's Conduct in this Litigation Does Not Show Intent to Deprive

G-Star's conduct during this litigation does not demonstrate intent to deprive. *See* pp. 22-24 *above*. For one, the objections to Plaintiff's document demands do not improperly suggest review of the complete Email File or SAP data, as stated in the RR. It is not improper to object to discovery demands as being overbroad and unduly burdensome in the first instance, simply based on the breadth of evidence being sought. The RR also omits that G-Star's objections on the basis of privilege, confidentiality, and lack of relevance were only made "to the extent" applicable. *See* Matz Decl., Exs. 19, 22. Moreover, the objections were based on review of evidence then in counsel's possession, knowledge of Plaintiff's job responsibilities, and witness interviews.

Additionally, contra the RR, G-Star proposed search terms in good faith in order to facilitate discovery of other employees' .pst email files *as well as* emails in the Reconstruction. Application of search terms to other employees' .pst email files would have potentially yielded thousands of emails from the Email File. It is a fair inference that application of search terms to the Email File would also have yielded discoverable evidence to Plaintiff. For these reasons, the RR's finding that such searches of the Reconstruction would have been "futile" is not correct.[16]

---

16. No case cited in the RR compels a finding that G-Star acted with intent to deprive. *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833 (D. Del. July 12, 2016) (senior executive deleted thousands of his emails and directed other employees to delete emails after lawsuit was filed, and other executives directed that competitors be referred to by code words to evade discovery); *O'Berry v. Turner*, 2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) (counsel waited more than 2 years to contact custodian of documents repeatedly requested by movant's counsel to discuss requests or obtain copies); *Moody v.*

### E.  Because the Intent to Deprive Cannot Be Shown, No Adverse Inference Sanction May Be Awarded.

G-Star agrees with the RR's recommendation that the circumstances do not warrant striking G-Star's pleading or affirmative defenses, or issuing a preclusion order. Yet, as shown above, an adverse inference instruction is not warranted. "An adverse-inference instruction that missing evidence may or should be presumed to be unfavorable to the party who destroyed the evidence has long been considered an 'extreme' sanction that 'should not be given lightly.'" *Lokai*, 2018 WL 1512055, at *8 (quoting *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 219-20 (S.D.N.Y. 2003)). The Rule 37(e)(2) sanction of adverse inference requires a proper finding of intent to deprive to warrant this "extreme sanction." The circumstances here do not support such a finding. Accordingly, this Court should reject the RR's recommendation that an adverse inference be given.

<u>CONCLUSION</u>

For all the above reasons, G-Star respectfully requests that this Court reject the RR, find that the requirements for imposing Rule 37(e) sanctions have not been established here, decline to sanction G-Star, and award G-Star any such other and further relief as this Court may deem just and proper.

Dated: July 3, 2019                              Fox Horan & Camerini LLP
     New York, New York                    By: <u>/s/ Kathleen M. Kundar</u>
                                           Kathleen M. Kundar

---

*CSX Transp., Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017) (defendants failed to access spoliated files – the most important evidence in the case – to ensure they were properly preserved at any point during the 4 years the case was pending); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. 2017) (plaintiff purposefully deleted, failed to preserve, and concealed "highly relevant and undeniably responsive emails … throughout th[e] litigation and during discovery disputes," including emails "indicat[ing] efforts by Plaintiff to direct the exact contents of [a] witness statement"). In fact, that G-Star did not act with intent to deprive is bolstered by *Ungar v. City of N.Y.*, 329 F.R.D. 8 (E.D.N.Y. 2018) (cited at RR, p.30) (finding no intent to deprive because evidence was deleted before alleged spoliator was on notice that litigation was likely).