UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINE HAZEL S. CRUZ,

Plaintiff,

- against -

G-STAR INC., G-STAR USA LLC, and G-
STAR RAW C.V.,

Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 7685 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Before the Court are objections filed by Plaintiff Christine Hazel S. Cruz and

Defendants G-Star Inc., G-Star USA LLC, and G-Star Raw C.V. to Magistrate Judge Ona

Wang's June 19, 2019 Report & Recommendation ("R&R") concerning Plaintiff's motion for

discovery sanctions based on alleged spoliation of evidence. (R&R (Dkt. No. 89)) In the R&R,

Judge Wang grants Plaintiff's request for discovery sanctions. (Id. at 34; see also Pltf. Mot. for

Sanctions (Dkt. No. 42))[1] For the reasons stated below, Plaintiff's objections will be overruled,

and Defendants' objections will be sustained in part and overruled in part.

## BACKGROUND

## I. FACTS

### A. Plaintiff's Employment at G-Star and Her Termination

Defendants G-Star USA LLC and G-Star Inc. are wholesale and retail denim

clothing distributors formed under the laws of Delaware and based in New York. (R&R (Dkt.

---

[1] Except as to deposition transcripts, all citations in this Opinion reflect page numbers assigned
by this District's Electronic Case Filing system. Citations to depositions reflect the transcript
page numbers.

No. 89) at 3) On January 1, 2013, G-Star USA LLC merged with G-Star Inc. (Id.) Defendant

G-Star Raw C.V., a company headquartered in Amsterdam, is the sole shareholder of G-Star Inc.

(Id.)

Plaintiff is an Asian woman, and was employed by Defendants from November 1,

2012 to January 27, 2017. (Cmplt. (Dkt. No. 1-2) ¶ 3) From November 2012 until December

2015, Plaintiff was employed as a "senior sales back office employee." (Id. ¶¶ 14, 22) Her main

role in that position "was to be the contact person for any problems that occurred with the [Point

of Sale] system, inventory, and customer service representatives." (Id. ¶ 15) In December 2015,

Plaintiff was promoted to Country Retail Operations Coordinator. (Id. ¶ 22) In this new

position, Plaintiff retained her prior responsibilities but was also "required . . . to be involved in

the operations aspect of G-Star owned stores." (Id. ¶ 23)

Plaintiff alleges that, during her employment with Defendants, she was not paid

overtime (id. ¶¶ 17-31), and that she was subjected to race and gender discrimination, sexual

harassment, and a hostile work environment. (Id. ¶¶ 32-78)

1.    **Plaintiff's Complaints to Human Resources**

On September 24, 2016, Plaintiff sent an email to Willemien Storm, G-Star Inc.'s

head of human resources, complaining about her working conditions. (Id. ¶ 83) Plaintiff states

that she is "intentionally being overworked," that she is "being forced to carry other people's

responsibility," that she "find[s] [herself] working well over 40 hours per week," and that she has

been forced "to work in excess of 12 hours per day on multiple occasions." (Sept. 25, 2016 Cruz

email (Dkt. No. 45-8)) Plaintiff further states that her concerns "have been overlooked" and that

"senior management in the US office has ignored all my complaints." (Id.) She also complains

2

that co-worker, Kendra Palmer, "is fostering a hostile work environment" by "conspir[ing] to fire [her]" by "overload[ing] [her] plate so much that [she] can't humanly keep up." (Id.)

In a September 28, 2016 email to Plaintiff, Storm asks for more information and offers to speak with Plaintiff over the telephone. (Sept. 28, 2019 Storm email (Dkt. No. 45-7 at 3)) Storm forwarded her response to Plaintiff in an email she sent to Palmer; Juan Garcia – G-Star Inc.'s Vice President of Wholesale; Tony Lucia, G-Star Inc.'s CEO of North America; and Fanny Smits, another G-Star employee. (Sept. 28, 2019 Storm email (Dkt. No. 45-7 at 2)) That email also reflects legal advice Storm had obtained from Kathleen M. Kundar, Defendants' outside counsel. (Id. at 3)

On October 5, 2016, Plaintiff and Storm spoke by telephone about Plaintiff's concerns. (Oct. 5, 2016 Storm email (Dkt. No. 45-11 at 3-4)) Storm sent Plaintiff a follow-up email afterward, summarizing what they had discussed. (Id.) Storm's email states: "I asked if you are prepared to work on improving the relationship with [Palmer]. You answered that you are not comfortable answering that question and that you want to discuss with your lawyer first." (Id. at 3) Storm concludes her email by stating that "[w]e agreed that you will come back to me after you have consulted your lawyer. In the meantime, I will address the workload issues in the SBO team with [Garcia] and [Palmer]." (Id. at 4)

In an October 7, 2016 email to Storm, Plaintiff states that Storm mischaracterized their discussion. (Oct. 7, 2016 Cruz email (Dkt. No. 45-11 at 2)) Plaintiff states: "we discussed the fact that [Palmer] is openly telling people she wants to fire me and I have texts that back up that claim. At this stage, on advice of counsel, I will not be forwarding the text[s]." (Id.) Although Plaintiff notes that she has asked "[Storm] to intervene, to ensure a safe, non-threatening, pleasant work environment," Plaintiff's complaints are focused on Plaintiff "being

3

forced to take on more work than humanly possible" and on her belief that Palmer is engaged in "a campaign . . . to terminate" her.  (Id.)

In a January 9, 2017 email to Storm, Plaintiff complains that Palmer and other managers have submitted performance evaluations for Plaintiff's team – one of Plaintiff's job responsibilities – while Plaintiff was out on paid leave.  (Jan. 9, 2017 Cruz email (Dkt. No. 45-13 at 2-4))  Plaintiff states that "[she] was not involved nor informed by" her co-workers "that evaluations were being conducted on [her] behalf."  (Id. at 3)  Storm replied to Plaintiff's email on January 13, 2017, stating that she believed the matter had been resolved, because Plaintiff had "already spoken with [Palmer]."  (Jan. 3, 2017 Storm email (Dkt. No. 45-13 at 2))

### 2.    Plaintiff's Termination

On October 10, 2016, Palmer sent Storm, Garcia, and another G-Star employee – Wouter Geerdink – an email listing examples of "behavioral and performance related issues . . . with [Plaintiff]."  (Oct. 10, 2016 Palmer email (Dkt. No. 45-12 at 2))  On October 11, 2016, Storm provided Palmer with a draft of "the reasons for [Plaintiff's] employment termination."  (Oct. 11, 2019 Storm email (Dkt. No. 45-17 at 2))  Storm asked Palmer and Garcia to "fill in the blanks" so that the draft could be "reviewed by the lawyer" that same day.  (Id. at 2-3)[2]

After Plaintiff's September 24, 2016 email complaint to Storm, Defendants reduced Plaintiff's workload.  (Cmplt. (Dkt. No. 1-2) ¶ 87)  Moreover, at an October 13, 2016 meeting with Plaintiff, Storm, Palmer, and Garcia discussed "creating a team environment, better work, [and] better spirit."  (Id. ¶ 85; Storm Dep. (Dkt. No. 50-3) at 181)  Storm followed up with Plaintiff "about two weeks" later.  (Id. at 181)  According to Storm, Plaintiff "was not overly

---

[2]  As noted by Judge Wang, "[i]t is unclear whether Ms. Storm meant Ms. Kundar or Defendants' in-house counsel."  (R&R (Dkt. No. 89) at 8)

excited" and "not everything was solved at that time." (Id. at 182) Plaintiff claims that, after the October 13, 2016 meeting, Storm, Palmer and Garcia "t[ook] away the new responsibilities that [she] had been given, effectively demoting [her] to the role she was first in." (Cmplt. (Dkt. No. 1-2) ¶ 87) Plantiff further complains that "[she] was not even notified about some of these role reductions, until after they had been taken away from her, which was further humiliating and embarrassing." (Id. ¶ 92)

On January 27, 2017, G-Star, Inc. terminated Plaintiff. (Jan. 27, 2017 Ltr. (Dkt. No. 45-14)) In the notice of termination, Defendants offered Plaintiff a severance package in exchange for a release of all claims arising out of her employment. (Id.) Plaintiff rejected the offer and did not sign the release. (Palmer Dep. (Dkt. No. 50-4) 22-23)

## B.    Alleged Spoliation of Evidence

### 1.    Deletion of Plaintiff's Email Account and Notice of Claim

On January 27, 2017, the date of Plaintiff's termination, G-Star shut down her email account. (van der Bent Decl. (Dkt. No. 51) ¶¶ 4-5) According to Rob van der Bent, a G-Star Information Communication Technology ("ICT") manager, "when an employee is terminated, Human Resources informs the IT helpdesk of the termination of [the] employee and as per the date of termination, the Windows account which includes email is immediately shutdown. This means that the account is locked. The user cannot access or use it anymore." (Id.) Moreover, "about two months after an individual's employment ends, the Windows Account is deleted unless an instruction has been received to hold the account for litigation purposes or some other purpose." (Id. ¶ 6) On March 6, 2017, the ICT department "saw that [Plaintiff's] Windows account . . . had not yet been deleted and there was no record of a hold

having been placed on the email account, so [the ICT department] proceeded with the deletion of it in accordance with our policy." (Id.)[3]

Gary Adelman, Plaintiff's counsel, states that he called Defendants "in or around late March of 2017" and "left a message with Defendants regarding claims that Plaintiff was contemplating bringing against Defendants." (Adelman Decl. (Dkt. No. 43) ¶ 3) Defense counsel Kundar returned Adelman's call on April 3, 2017. (Id. ¶ 4) In that conversation, Adelman "told [Kundar] that Plaintiff [was] planning to pursue claims against Defendants for among other things, FLSA and NYLL violations, based on unpaid overtime wages, as well as sexual harassment, hostile work environment, discrimination based on race and gender, and retaliation." (Id.) In response, Kundar asked Adelman to send her a letter "outlining the claims [Plaintiff] was contemplating bringing against Defendants." (Id. ¶ 5) To facilitate that communication, in an April 3, 2017 email, Kundar provided Adelman with her contact information. (Id.; see also April 3, 2017 Kundar email (Dkt. No. 43-1 at 3)) Kundar represents that "[f]rom April 3, 2017 until July 20, 2017, [she] did not have any contact with anyone representing Hazel Cruz." (Kundar Decl. (Dkt. No. 50) ¶ 14)

At about the time Adelman contacted Defendants, Lucia received a telephone call from Mourad Elayan, a former franchisee of G-Star, informing him that Plaintiff was going to sue G-Star, and that he and Palmer would be mentioned in the lawsuit. (Palmer Dep. (Dkt. No. 50-4) at 21-23; see also Def. Br. (Dkt. No. 53) at 8) Palmer then asked Human Resources

---

[3] Defendants initially informed Judge Wang that Plaintiff's email account was deleted on June 3, 2017. (R&R (Dkt. No. 89) at 10) Defendants later informed the court that van der Bent had incorrectly reported the date of deletion, because he had assumed the date of the deletion log was in "European style," when in fact "the deletion log was in US style dating." (van der Bent Decl. (Dkt. No. 51) ¶ 9) This Court does not see any error in Judge Wang's decision to credit van der Bent's explanation for the mistaken date. (R&R (Dkt. No. 89) at 10 n.7)

whether Plaintiff had returned a signed severance agreement. (Palmer Dep. (Dkt. No. 50-4) 22-23) Human Resources informed Palmer that Plaintiff had not returned a signed severance agreement. (Id.)

In a July 20, 2017 letter to Kundar, Plaintiff outlines her claims and states that she intends to file a lawsuit alleging claims under the Fair Labor Standards Act, the New York Labor Law, and the New York City Human Rights Law. (July 20, 2017 Ltr. (Dkt. No. 50-8)) On July 25, 2017, Kundar "gave G-Star HR a first list of documents to assemble and, . . . , [] spoke with G-Star in-house counsel about the need to preserve evidence." (Kundar Decl. (Dkt. No. 50) ¶ 15) ITC manager van der Bent confirms that in "late July 2017," the ICT department was "informed to put a hold on various email accounts including for Hazel Cruz because litigation had been threatened by her lawyer." (van der Bent Decl. (Dkt. No. 51) ¶ 7) According to van der Bent, the ICT department put a hold on the requested email accounts, but "no one took note that the email of Hazel Cruz had already been deleted." (Id.)

## 2. Post-Complaint Conduct

The Complaint was filed in Supreme Court of the State of New York, New York County, on September 1, 2017. (Dkt. No. 1-2) In an October 2, 2017 email, Kundar provided Defendants' in-house counsel and Human Resources representatives with an "extended list of documents that were needed" for the litigation. (Kundar Decl. (Dkt. No. 50) ¶ 18) A copy of that e-mail is not in the record, but Kundar represents that she told her clients that "[w]e eventually will have to p[roduce] many emails from the years of Hazel's e[]mployment. I will work on a list of reasonable search terms." (Id. ¶ 18 (alterations in original))

On October 6, 2017, Defendants removed the action to federal court. (Dkt. No. 1) This Court scheduled a Rule 16 conference for February 1, 2018. Prior to that conference, the

7

parties had a telephonic Rule 26(f) conference, during which Plaintiff's counsel told defense counsel of his intention to seek email communications. (Matz Decl. (Dkt. No. 45) ¶ 20) Kundar represents that, at that time, "[she] did not know that Plaintiff's emails had been deleted. [She] assumed that they had been preserved based on [her] specific mention of Plaintiff's emails in the list [she] provided [her] clients on October 2, 2017." (Kundar Decl. (Dkt. No. 50) ¶ 22) According to Kundar, Plaintiff's counsel did not mention that he would be seeking "SAP, Retail Pro and Sales Force files" in discovery. (Id.)

On March 8, 2018, Plaintiff served her first request for production of documents. Plaintiff demanded, inter alia, "[d]ocuments and communications sufficient to evidence the time and date of Plaintiff's logins to or use of SAP, but not limited to a login report, log and/or audit trail," and "a table style printout of Plaintiff's sent and received email." (Pltf. First Doc. Req. (Dkt. No. 45-18) at 9, 10)[4]

In response to Plaintiff's document requests, Defendants' in-house counsel directed van der Bent to "search for various emails relating to G-Star Inc. and Hazel Cruz, and instructed [him] not to delete the account for Hazel Cruz and files attached to that account." (van der Bent Decl. (Dkt. No. 51) ¶ 8) Defendants' in-house counsel also instructed another ICT manager, Klaas Buist, to "provide documents and communications sufficient to evidence the time and date of Hazel Cruz['s] logins to or use of SAP, Retail Pro and Sales force including but not limited to a login report, log and/or audit trail." (Buist Decl. (Dkt. No. 52) ¶ 5) Van der

---

[4] SAP is a computer program that Plaintiff used to "enter orders and run reports." (Cruz Decl. (Dkt. No. 44) ¶¶ 5-6) Plaintiff claims that she "frequently worked before and after regularly scheduled hours" and "would log into SAP and [her] email to respond to inquiries, enter orders and send reports to account managers." (Id.)

Bent then informed in-house counsel "that the email account of Hazel Cruz had already been deleted." (van der Bent Decl. (Dkt. No. 51) ¶ 8)

Buist asserts that the deletion of Plaintiff's email account in March 2017 "caused a glitch in the hold process" and "as a consequence the people performing the deletion of SAP, were not informed of any hold." (Buist Decl. (Dkt. No. 52) ¶ 7) As a result, Plaintiff's SAP account "was locked on 17 May 2017" and "finally deleted end of December 2017 during the periodic clean-up of SAP accounts." (Id.)

In late March 2018, Defendants' in-house counsel informed Kundar that Plaintiff's email had been deleted. (Kundar Decl. (Dkt. No. 50) ¶ 24) In-house counsel then instructed van der Bent to reconstruct Plaintiff's email file – in .pst format – from archived records. (van der Ben Decl. (Dkt. No. 51) ¶ 11) The ICT department was "able to assemble a PST file of [Plaintiff's email] messages . . . but the messages were not always complete because only a few lines of the text show in the archival form." (Id.; see, e.g., April 29, 2013 Cruz e-mail (Dkt. No. 58-5)) However, "all of the messages in the PST file showed who was the sender, receiver and copy readers," as well as "the date and time the messages were sent." (van der Ben Decl. (Dkt. No. 51) ¶ 11)

On April 9, 2018, Defendants served written responses to Plaintiff's first set of document requests. (Def. Resp. to Pltf.'s First Doc. Req. (Dkt. No. 45-19)) Defendants did not disclose that Plaintiff's email account and SAP data had been deleted. Instead Defendants objected to Plaintiff's request for documents evidencing the time and date of Plaintiff's logins to SAP as "overly broad, unduly burdensome, vague and ambiguous." (Id. at 15) Defendants also stated that they did not possess "login reports, logs, and/or audit trails." (Id.) As to Plaintiff's request for a "table style printout of Plaintiff's sent and received email[s]," Defendants objected

on the grounds that (1) the request "is overly broad, unduly burdensome, oppressive, vexatious, and harassing"; (2) the request "seeks the disclosure of documents that are shielded from disclosure by the attorney work product doctrine"; (3) the request "seeks the disclosure of confidential, proprietary, or sensitive information"; and (4) the request seeks disclosure of "documents and information that are not relevant to this litigation and is not reasonably calculated to lead to the discovery of admissible evidence." (Id. at 16-17)

After Defendants served their response to Plaintiff's document requests, the parties met and conferred on three separate occasions regarding outstanding discovery issues, including Defendants' failure to produce a "table style printout of Plaintiff's sent and received email." (Matz Decl. (Dkt. No. 45) ¶¶ 21, 26)  The parties also participated in (1) a May 3, 2018 status conference before this Court; (2) a June 19, 2018 pre-settlement conference before Judge Wang; and (3) a June 28, 2019 telephone conference before Judge Wang.  Defendants did not disclose at any of these meetings and conferences that Plaintiff's email account and SAP data had been deleted, or that Defendants had tried to reconstruct Plaintiff's email but were unable to do so. (Id. ¶¶ 21, 26-27)

On June 20, 2018, Defendants served an amended response to Plaintiff's document requests. (Dkt. No. 45-22)  Defendants objected to Plaintiff's request for "[d]ocuments and communications sufficient to evidence the time and date of Plaintiff's logins to or use of SAP," asserting that the request "is overly broad, unduly burdensome, vague, and ambiguous." (Id. at 16)  Defendants also objected to Plaintiff's request for a "table-style printout" of Plaintiff's emails, arguing that the request (1) "is overly broad, unduly burdensome, oppressive, vexatious, and harassing"; and (2) seeks disclosure of "documents and information that are not relevant to this litigation and is not reasonably calculated to lead to the discovery of

admissible evidence." (Id. at 17).  In early July 2018, Defendants proposed that the parties use keyword search terms to identify relevant documents.  (See July 3, 2019 Mevorah email (Dkt. No. 45-9)).

On July 18, 2018, the parties submitted a joint letter to this Court outlining outstanding discovery issues, and requesting a conference.  (Dkt. No. 27).  On July 23, 2018, this Court issued an amended Order of Reference referring the parties' discovery disputes to Judge Wang.  (Dkt. No. 28).  Judge Wang thereafter ordered the parties to meet and confer with respect to the issues raised in their July 18, 2018 letter, and scheduled a discovery conference for August 2, 2018. (Dkt. No. 29).

On July 26, 2018, the parties conducted a telephonic meet and confer in preparation for the August 2, 2018 conference.  On that call, Defendants disclosed to Plaintiff – for the first time – that Defendants had deleted Plaintiff's email and SAP accounts.  (Matz Decl. (Dkt. No. 45) ¶ 31; Kundar Decl. (Dkt. No. 50) ¶ 34)  Kundar sent an email to Plaintiff's counsel later that day attaching G-Star policies concerning the deletion of SAP and certain other programs, not including email.  (See July 26, 2018 Kundar email (Dkt. No. 45-23); Dkt. No. 45-24)  In her July 26, 2018 email, Kundar wrote that "G-Star reports that mailboxes are deleted two months after the termination date unless blocked by HR or Legal in accordance with the IT Audit policy."  (July 26, 2018 Kundar email (Dkt. No. 45-23))  Defendants have not provided a copy of their policy regarding deletion of email accounts.

On August 2, 2018, the parties appeared before Judge Wang.  At that conference, Plaintiff asked that Defendants be directed to produce Plaintiff's entire email file.  (Aug. 2, 2018 Tr. (Dkt. No. 32) at 4)  Defendants informed Judge Wang – for the first time – that Defendants had deleted Plaintiff's email account.  (See Aug. 2, 2018 Tr. (Dkt. No. 32) at 6-7)  After hearing

oral argument, Judge Wang ordered Defendants to produce Plaintiff's .pst email file in its entirety by August 9, 2019. (Id. at 16) Defendants delivered Plaintiff's .pst email file to Plaintiff's counsel on August 9, 2018. (See Aug. 9, 2018 Ltr. (Dkt. No. 45-25))

Judge Wang was not able to view the emails Defendants provided to Plaintiff, because the thumb drive provided by Defendants was corrupted. (R&R (Dkt. No. 89) at 18 n.9) However, based on the parties' representations, Judge Wang concluded that

> [o]f the 114,812 emails contained in the .pst file, 109,117, or approximately 95%, are in the archived format. (Pl. Mem. of Law at 7). 200 emails are virtually blank. (Pl. Mem. of Law at 8).
>
> In addition to the .pst email file, Defendants produced 2,541 pages of complete emails, (Kundar Decl., Ex. M), and complete versions of 2016 emails showing Plaintiff's work schedule on certain dates. (Kundar Decl. ¶ 39). Defendants do not identify where or how they obtained these emails. Ms. Kundar did represent that Defendants identified other employees whose email files would contain messages to or from Plaintiff or would have copied Plaintiff. (Id. ¶ 25). Specifically, Defendants preserved seven other custodians' email files for use in this litigation. (Id. ¶ 33). The record is devoid of any evidence, however, on whether a search of these custodians' email files was ever conducted, and if so, whether the 2,541 pages and 2016 emails are the results of such a search.

(Id. at 18)

As to Plaintiff's SAP data, Judge Wang states that

> [i]n October 2018, Defendants attempted to restore Plaintiff's SAP data, which Defendants had deleted ten months earlier. In October 2018, with the assistance of a technical specialist, Mr. Buist was able to obtain data showing the date and time of each sales order created by Plaintiff's username. (Buist Decl. ¶ 10). Defendants produced tables from the SAP system for 2014-2017 showing the times Plaintiff used the SAP system to enter orders. (Kundar Decl. ¶ 37). Mr. Buist does not explain whether more information – such as Plaintiff's log-in and log-out times and data regarding the running and sending of reports – would have been available had Defendants not deleted Plaintiff's SAP account. Finally, Defendants produced "more than 1,000 pages of daily log-in information for the office computers used by Plaintiff," weekly attendance lists, and Plaintiff's absence record. (Kundar Decl. ¶ 39).

(Id.)

## C. Plaintiff's Motion for Sanctions

On October 1, 2018, Plaintiff moved for sanctions, arguing that (1) Defendants acted willfully in destroying Plaintiff's email file and other electronically stored information ("ESI"); (2) the missing evidence is relevant to Plaintiff's claims; and (3) Plaintiff is entitled to sanctions in the form of a default judgment. (Pltf. Mot. (Dkt. No. 45); Pltf. Br. (Dkt. No. 46)) Plaintiff also claims that she is entitled to an adverse inference instruction. (Pltf. Br. (Dkt. No. 46) at 29-30)

### 1. Judge Wang's R&R

On November 29, 2018, this Court referred Plaintiff's motion to Judge Wang for an R&R. (Dkt. No. 74) On June 19, 2019, Judge Wang issued her R&R, recommending that this Court grant Plaintiff's motion for sanctions. (Dkt. No. 89) Judge Wang concludes that (1) Defendants' duty to preserve Plaintiff's ESI arose in October 2016 when Plaintiff complained to G-Star's Human Resources Department; (2) Defendants failed to take reasonable steps to preserve Plaintiff's ESI; (3) Plaintiff's ESI cannot be restored or replaced; (4) Plaintiff has been prejudiced by Defendants' failure to preserve ESI; and (5) Rule 37(e)(2) sanctions should be imposed because "the circumstances surrounding Defendants' spoliation of ESI support an inference that Defendants acted with the intent to deprive Plaintiff of evidence." (Id. at 21-33) As to sanction, Judge Wang recommends that this Court give an adverse inference instruction at trial. (Id. at 33-34) On July 19, 2019, Judge Wang issued a separate order granting Plaintiff motion for an award of attorney's fees and costs. (Dkt. No. 90)[5]

---

[5] Judge Wang has not yet determined the amount of the award for attorneys' fees and costs.

13

## 2. The Parties' Objections to the R&R

On July 3, 2019, Plaintiff filed an objection to the R&R, arguing that "[t]he [r]emedy of [a]dverse [i]nference [d]oes [n]ot [f]it the [w]rong," and that "Defendants' [i]ntentional [s]poliation of ESI [w]arrants [e]ntry of [d]efault [j]udgment." (Dkt. No. 95 at 18, 22)

On July 9, 2019, Defendants filed objections to the R&R, arguing that an adverse inference instruction is not warranted because, inter alia, (1) as of October 2016, when Plaintiff complained to Human Resources, G-Star had no reason to believe that litigation with Plaintiff was likely; (2) Defendants took reasonable steps to preserve all relevant evidence; (3) Plaintiff has not suffered any prejudice, because the lost evidence can be obtained from other sources; and (4) Defendants' actions do not support an inference that they acted with "the intent to deprive Plaintiff of evidence for use in this litigation." (Def. Obj. (Dkt. No. 97) at 7-8)

Defendants have also filed an objection to Judge Wang's order granting Plaintiff an award of attorneys' fees and costs. (Dkt. No. 99)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Standard of Review

In Plaintiff's sanctions motion, she requests, inter alia, that the Court strike Defendants' answers and grant Plaintiff default judgment on her claims. (Pltf. Br. (Dkt. No. 46) at 27) Accordingly, this Court referred Plaintiff's motion to Judge Wang as a "dispositive motion" requiring a Report and Recommendation. (Dkt. No. 74)

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide," the district judge "must consider timely objections and modify or set aside any part of

14

the order that is clearly erroneous or is contrary to law." Pursuant to Rule 72(b)(3), when a dispositive motion has been referred to a magistrate judge, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."

"To determine whether a magistrate judge's ruling regarding discovery sanctions is 'dispositive,' the Court must look to the effect of the sanction – if imposed." Khatabi v. Bonura, No. 10 Civ. 1168 (ER), 2017 WL 10621191, at *3 (S.D.N.Y. Apr. 21, 2017); see also Kiobel v. Millson, 592 F.3d 78, 97 (2d Cir. 2010) ("Analyzing the effects of the particular sanction imposed by a magistrate judge, to determine whether it is dispositive or nondispositive of a claim, is the approach that best implements Congress's intent."). "Thus, in determining between dispositive and non-dispositive discovery sanctions, the critical factor is what sanction the magistrate judge actually imposes, rather than the one requested by the party seeking sanctions." Id. (emphasis in original); see also UBS Int'l Inc. v. Itete Brasil Instalacoes Telefonicas Ltd., No. 09 Civ. 10004 (LAK) (JCF), 2011 WL 1453797, at *1 (S.D.N.Y. Apr. 11, 2011) ("A magistrate judge . . . , has the authority to issue less severe sanctions, including preclusion orders, in the course of overseeing discovery.").

Here, Judge Wang denied Plaintiff's request to strike Defendants' answers and enter default judgment. (R&R (Dkt. No. 89) at 2) Because Judge Wang "did not impose any terminating sanctions," "the Court treats [her] ruling as non-dispositive." Khatabi, 2017 WL 10621191, at *3; see also Rosa v. Genovese Drug Stores, Inc., No. 16-cv-5105 (NGG) (LB), 2017 WL 4350276, at *1 (E.D.N.Y. July 31, 2017) (treating a magistrate judge's order imposing an adverse inference instruction sanction as non-dispositive, and reviewing the order under a "clearly erroneous" standard); Apple Inc. v. Samsung Elecs. Co., 888 F. Supp. 2d 976, 988 (N.D. Cal. 2012) (holding that adverse inference instruction sanction does not "'have an effect similar

to those motions considered dispositive'" (quoting <u>Maisonville v. F2 Am., Inc.</u>, 902 F.2d 746,

748 (9th Cir. 1990))). Because Judge Wang's ruling is non-dispositive, this Court will review

the portions of her Report & Recommendation to which the parties have objected under the more

deferential "clearly erroneous" standard. <u>See</u> Fed. R. Civ. P. 72(a).

## B.    <u>Sanctions Under Fed. R. Civ. P. 37(e)</u>

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Byrnie v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted) (quoting <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999)). A party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation claim. <u>Id.</u> at 109; <u>accord</u> <u>Centrifugal Force, Inc. v. Softnet Commc'n, Inc.</u>, 783 F. Supp. 2d 736, 740 (S.D.N.Y. 2011) (citations omitted).

<u>Leidig v. Buzzfeed, Inc.</u>, No. 16-cv-542 (VM) (GWG), 2017 WL 6512353, at *8 (S.D.N.Y. Dec.

19, 2017).

Rule 37(e) of the Federal Rules of Civil Procedure, amended as of December 1,

2015, governs sanctions for failure to preserve ESI, and provides as follows:

(e) **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) Upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) Only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) Presume that the lost information was unfavorable to the party;

(B) Instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) Dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Rule 37(e)

amended the traditional spoliation rule as it related to ESI in a number of ways – most significantly, by providing that the harsh sanctions listed in Rule 37(e)(2) were to be applied only in cases in which a party acted with "intent to deprive" another of ESI. See Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.

Leidig, 2017 WL 6512353, at *8.

## II. ANALYSIS

### A. Defendants' Objections to the R&R

As discussed above, Defendants contend that no sanction is appropriate because (1) as of October 2016, when Plaintiff complained to Human Resources, G-Star had no reason to believe that litigation with Plaintiff was likely; (2) Defendants took reasonable steps to preserve all relevant evidence; (3) Plaintiff has not suffered any prejudice, because the lost evidence can be obtained from other sources; and (4) Defendants' actions do not support an inference that they acted with "the intent to deprive Plaintiff of evidence for use in this litigation." (Def. Obj. (Dkt. No. 97) at 7-8)

#### 1. When Defendants' Duty to Preserve Arose

Judge Wang concludes that "Defendants had a duty to preserve no later than October 2016," when Plaintiff complained to Willemien Storm of G-Star's Human Resources Department about her workload and her concerns that Palmer was scheming to terminate her employment. (R&R (Dkt. No. 89) at 22; see also Oct. 7, 2016 Cruz email (Dkt. No. 45-11 at 2)) In concluding that Defendants' duty to preserve arose in October 2016, Judge Wang cites the following facts: (1) within four days of receiving Plaintiff's complaint, Storm – Defendants' Human Resources director – contacted Defendants' senior management and sought legal advice from Defendants' outside counsel; (2) during the three weeks after Storm received Plaintiff's complaint, Defendants compiled reasons to terminate Plaintiff, which "included careful documentation and consultation with an attorney"; and (3) Defendants knew that Plaintiff was

17

consulting an attorney in October 2016, because Plaintiff indicated as much in her exchanges with Defendants' human resources department.[6] (Id. at 22-23) According to Judge Wang, "[t]hese circumstances combined with the content of Plaintiff's complaint makes clear that the relevant people at G-Star anticipated litigation by October 2016." (Id. at 23)

Defendants contend that Judge Wang "incorrectly found that G-Star's duty to preserve was triggered in October 2016," because Defendants "had no reason to conclude that litigation was likely at that time." (Def. Obj. (Dkt. No. 97) at 19) Defendants argue that they did not know that litigation was likely in October 2016, because Plaintiff's complaints to Storm "did not mention any actionable harassment or discrimination or request any additional wages." (Id.) Moreover, "[a]lthough Plaintiff made mention of a lawyer at the time of [her complaint to Storm], Plaintiff never identified any lawyer and no lawyer ever surfaced during the parties' internal efforts to resolve the matter." (Id. at 20) Finally, Defendants contend that the fact "[t]hat G-Star contacted Ms. Kundar to discuss [Plaintiff's complaint to Storm] . . . amounts to nothing more than sensibly seeking advice." (Id. at 20) According to Defendants, "[i]t cannot be that anytime any employee complains to an employer – regardless of whether any actionable conduct is asserted and regardless of whether the employer consults with counsel – the employer must immediately expect litigation to be likely and impose a litigation hold." (Id.)

The first element of the traditional spoliation test requires the moving party to demonstrate that "'the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed.'" Byrnie, 243 F.3d at 107 (quoting Kronisch v. United States, 150

---

[6] Given that (1) Plaintiff's first complaint to Storm was on September 24, 2016; (2) Storm forwarded her email traffic with Plaintiff to G-Star's senior management on September 28, 2016; and (3) Storm consulted outside counsel at this time (Sept. 28, 2016 Storm email (Dkt. No. 45-7)), it is not entirely clear to this Court why the parties and Judge Wang focus exclusively on October 2016.

18

F.3d 112, 126 (2d Cir. 1998))) Generally, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001). The obligation arises "most commonly when suit has already been filed, providing the party responsible . . . with express notice, but also on occasion . . . when a party should have known that the evidence may be relevant to future litigation." Kronisch, 150 F.3d at 126-27.

Here, this Court disagrees with Judge Wang's determination that Defendants' duty to preserve evidence arose in October 2016, and concludes that that finding is clearly erroneous. As an initial matter, in none of Plaintiff's communications with Storm in September and October 2016 does she articulate any sort of legal claim. She does not complain, for example, that she is not being paid overtime compensation. Nor does she suggest that she is the victim of sexual harassment or that she is suffering discrimination based on race, sex, or another forbidden factor. While she accuses Palmer of creating a "hostile work environment," that accusation is based on Palmer's alleged practice of "overload[ing]" Plaintiff with work, and "conspir[ing] . . . to fire her." (Sept. 25, 2016 Cruz email (Dkt. No. 45-8 at 2)) But Palmer's alleged practice of giving Plaintiff "more work than humanly possible [to complete]," and "campaign . . . to terminate [Plaintiff]" (Oct. 7, 2016 Cruz email (Dkt. No. 45-11 at 2)) – standing alone – provide no basis for a legal claim. Although Plaintiff mentions that she is consulting with an attorney, she does not state that she is planning to bring a lawsuit against Defendants.

The Court concludes that Plaintiff's complaints to Storm in September and October 2016 were not sufficient to alert Defendants that "litigation was likely" (see Fed. R. Civ.

19

P. 37 advisory committee note to 2015 amendment), nor did they trigger an obligation on Defendants' part to preserve ESI in compliance with Fed. R. Civ. P. 37(e).

Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003), cited by Judge Wang, is not to the contrary. There, the court found that the duty to preserve evidence arose before the filing of plaintiff's August 2001 EEOC complaint because (1) plaintiff's immediate supervisor admitted at his deposition that he feared litigation in April 2001, and (2) while "one or two employees contemplat[ing] the possibility that fellow employee might sue does not generally impose a firm-wide duty to preserve," "it appear[ed] that almost everyone associated with [plaintiff] recognized the possibility that she might sue." Id. at 216-17. Here, there is no evidence that anyone at G-Star believed – in September and October 2016 – that Plaintiff would sue. Indeed, as discussed above, none of Plaintiff's complaints to Storm appeared to present a basis for liability.

That Storm consulted with senior management and outside counsel at this time does not demonstrate that Defendants believed that "litigation was likely." Fed. R. Civ. P. 37 advisory committee note to 2015 amendment. Stated another way, seeking management or legal advice about how to address an employee's complaints, or about a possible future termination, does not demonstrate that one believes that litigation is imminent. Indeed, senior managers and legal counsel are often consulted so that litigation can be avoided. Similarly, the fact that Storm and Palmer began discussing a possible termination of Plaintiff in October 2016 does not demonstrate that they believed that litigation was likely. Not every termination of an employee results in litigation. Indeed, the vast majority of employee terminations do not result in litigation.

In sum, the possible future termination of a disgruntled employee does not present a likelihood of litigation where (1) the employee's complaints do not present a basis for a recognized cause of action; and (2) the employee has not threatened to bring a lawsuit or suggested that she will do so.

This Court concludes that Defendants' duty to preserve evidence arose on April 3, 2017, when Plaintiff's counsel told defense counsel "that Plaintiff [was] planning to pursue claims against Defendants for among other things, FLSA and NYLL violations, based on unpaid overtime wages, as well as sexual harassment, hostile work environment, discrimination based on race and gender, and retaliation." (Adelman Decl. (Dkt. No. 43) ¶ 4)

Because Plaintiffs' emails were deleted in March 2017, before Defendants' duty to preserve arose, Plaintiff "has failed to establish the first element of spoliation" as to those documents. Piccone v. Town of Webster, No. 09-CV-6266T, 2010 WL 3516581, at *7 (W.D.N.Y. Sept. 3, 2010). Plaintiff's SAP account was, however, deleted in December 2017, when Defendants were on notice of Plaintiff's lawsuit. Accordingly, this Court must address Judge Wang's determination that Defendants' duty to preserve extends to Plaintiff's SAP account.

## B. Whether Defendants' Duty to Preserve Extends to Plaintiff's SAP Account

"'While a litigant is under no duty to keep or retain every document in its possession[,] . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.'" Zubulake, 220 F.R.D. at 217 (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)); see also Leidig, 2017 WL 6512353, at *9 (obligation to

preserve evidence runs to "documents that a party knew or 'should have known' were relevant to future litigation"). For the purposes of Rule 37(e), "'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004))

Judge Wang determined that Defendants should have known that Plaintiff's SAP account was relevant to Plaintiff's claims, thereby triggering an obligation to preserve that account. (R&R (Dkt. No. 89) at 24) The Court concludes that Judge Wang's determination that, Defendants had a duty to preserve Plaintiff's SAP account is not "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a).

On April 3, 2017, Plaintiff's counsel informed Defendants that Plaintiff intended to assert claims under the Fair Labor Standards Act and the New York Labor Law relating to unpaid overtime compensation. (Kundar Decl. (Dkt. No. 50) ¶ 13) Any evidence probative of the amount of hours Plaintiff worked is relevant to her claims for overtime compensation.

Here, Plaintiff claims that she "frequently worked before and after regularly scheduled hours" and "would log into SAP and [her] email to respond to inquiries, enter orders and send reports to account managers." (Cruz Decl. (Dkt. No. 44) ¶¶ 5-6) Plaintiff further claims that "[t]he majority of [her] work with Defendants is documented in emails, SAP, RetailPro, and SalesForce." (Id. ¶ 6) Defendants have not disputed these assertions. It is thus obvious that Plaintiff's SAP account could shed light on whether she worked more than forty hours a week. Moreover, the declaration filed by Defendants' ICT department manager, Buist, indicates that, were it not for a "glitch" in the system, the July 2017 litigation hold would have

22

included Plaintiff's SAP account. (Buist Decl. (Dkt. No. 52) ¶ 7) The Court concludes that

Plaintiff's SAP account falls within the scope of Defendants' duty to preserve.

### C. Whether Defendants Took Reasonable Steps to Preserve Plaintiff's SAP Account

Plaintiff, as the party seeking sanctions, must show that defendants did not

"take reasonable steps to preserve" Plaintiff's SAP account. Moody v. CSX Transportation, Inc.,

271 F. Supp. 3d 410, 426 (W.D.N.Y. 2017); see also Fed. R. Civ. P. 37(e)(1).

In her R&R, Judge Wang concludes that

> Defendants deleted Plaintiff's SAP account in December 2017 despite the
> litigation hold. This deletion reflects that neither Defendants nor their counsel
> took "reasonable steps" to preserve Plaintiff's SAP account even after Plaintiff's
> Complaint had been filed. See Zubulake, 220 F.R.D. at 220 ("Once the duty to
> preserve attaches, any destruction of documents is, at a minimum, negligent.").
> Ms. Kundar's excuse that she was not aware of Plaintiff's SAP files is of no
> merit. Indeed, Ms. Kundar's ignorance of Plaintiff's SAP files (and both her and
> in-house counsel's ignorance of Plaintiff's emails' deletion until March 2018)
> indicates that neither counsel monitored Defendants' compliance with the
> litigation hold as required.

(R&R (Dkt. No. 89) at 25 (alterations in original))

Defendants argue, however, that Defense counsel took reasonable steps to

preserve Plaintiff's SAP account by (1) "advis[ing] in-house counsel of the need to preserve

evidence"; and (2) sending Defendants "list[s] of documents to assemble for use in this action."

(Def. Obj. (Dkt. No. 97) at 22) Defense counsel's obligations extend further than simply

advising her clients as to what documents might be necessary in the litigation, however. Counsel

has an obligation to "become fully familiar with her client's document retention policies, as well

as the client's data retention architecture." Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432

(S.D.N.Y. 2004) "This will invariably involve speaking with information technology personnel,

who can explain system-wide backup procedures and the actual (as opposed to theoretical)

implementation of the firm's . . . policy." Id. Here, there is no evidence that defense counsel

familiarized herself with Defendants' "document retention policies." And it appears that counsel was not aware of the technology that Plaintiff used every day at work. Accordingly, this Court finds no error in Judge Wang's conclusion that Defendants did not take reasonable steps to preserve Plaintiff's SAP account.

### D. Whether Defendants Acted with the Intent to Deprive Plaintiff of Data Stored In Her SAP Account

Rule 37(e) "permits sanctions such as an adverse inference instruction or dismissal only in instances in which the spoliating party acted with 'intent to deprive another party of the information's use in the litigation.'" Leidig, 2017 WL 6512353, at *10 (quoting Fed. R. Civ. P. 37(e)(2)(A)-(C))

Judge Wang concludes that

> the circumstances surrounding Defendants' spoliation of ESI support an inference that Defendants acted with the intent to deprive Plaintiff of evidence. Defendants' duty to preserve arose no later than October 2016 when Defendants consulted their outside litigation counsel, Ms. Kundar. After that time, Defendants had an obligation to preserve Plaintiff's ESI in the anticipation or conduct of litigation, yet Defendants took no reasonable steps to preserve Plaintiff's ESI, and now that ESI cannot be restored or replaced through additional discovery. Plaintiff's emails and SAP information were lost because Defendants failed to take any steps to preserve them prior to their deletion. See Ottoson v. SMBC Leasing & Fin., Inc., 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (failure "to take any reasonable steps to preserve" relevant evidence satisfies the requisite level of intent required by Federal Rule of Civil Procedure 37(e)(2)); Ungar v. City of New York, 329 F.R.D. 8, 13 (E.D.N.Y. 2018) ("[w]hether the spoliator affirmatively destroys the data, or passively allows it to be lost, is irrelevant; it is the spoliator's state of mind that logically supports the adverse inference"). Defendants' failure to take any steps to preserve Plaintiff's emails is particularly troubling because the particular individuals who received and discussed Plaintiff's first complaint to Human Resources – and consulted outside litigation counsel on a proper response – were the same individuals creating lists of reasons to terminate Plaintiff just two weeks later.
>
> Defendants' failure to impose a litigation hold before July 2017 was "so stunningly derelict as to evince intentionality." Moody v. CSX Transportation, Inc., 271 F. Supp. 3d 410, 431-32 (W.D.N.Y. 2017). In October 2016, Defendants – aware that Plaintiff had actively consulted with an attorney on matters included in her internal complaint, and who themselves sought and

received advice from outside litigation counsel and began taking steps to terminate Plaintiff's employment – did not impose a litigation hold. In early January 2017, Plaintiff filed a second complaint to Human Resources, but Defendants again chose not to impose a litigation hold. In late January 2017, after Defendants terminated Plaintiff's employment, Defendants again failed to impose a litigation hold. In March 2017, after Ms. Palmer noticed that Plaintiff had not returned the release of all claims arising out of her employment, and two months after Plaintiff's termination, Defendants still did not impose a litigation hold. In April 2017, Mr. Adelman called Ms. Kundar regarding Plaintiff's claims, but Defendants still did not impose a litigation hold. At each occasion, Defendants had more information and more reason to impose a litigation hold that would have preserved Plaintiff's ESI. Defendants failed at every opportunity. Such repeated failure, especially considering Ms. Kundar's involvement in providing advice since October 2016, evidences an intent to deprive. See Moody, 271 F. Supp. 3d at 431-432 ("defendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations . . . evince[s] intentionality"); O'Berry v. Turner, No. 15-CV-0064, 2016 WL 1700403, at *4 (M.D. Ga. Apr. 27, 2016) ("severe measures . . . are most appropriate to remedy the wrong"; "additional efforts to ensure the preservation of these materials once the spoliation letter was received" should have been made; "[s]uch irresponsible and shiftless behavior can only lead to one conclusion – that [defendants] acted with the intent to deprive").

(R&R (Dkt. No. 89) at 30-31)

Defendants object to Judge Wang's finding of intent because (1) "the duty to preserve did not attach in October 2016"; (2) there is no evidence that Defendants acted with an intent to deprive Plaintiff of the SAP data; and (3) Defendants' efforts to reproduce Plaintiff's SAP data refute a finding of intent to deprive. (Def. Obj. (Dkt. No. 97) at 27-29)

In urging this Court to find that Defendants acted with an intent to deprive, Plaintiff contends that Defendants' "conduct in this litigation" is so egregious as to constitute "circumstantial evidence" of their intent to deprive Plaintiff of relevant information. (Pltf. Resp. (Dkt. No. 108) at 30)

This Court concludes that Plaintiff has not shown that Defendants acted with the intent to deprive Plaintiff of relevant evidence. As an initial matter, this Court has ruled that Defendants duty to preserve ESI did not arise until April 3, 2017, when Plaintiff's counsel

25

alerted Defendants to Plaintiff's claims. By that time, Plaintiff's email account had already been deleted. Accordingly, Defendants failure to impose a litigation hold prior to April 3, 2017, is not proof of intent to deprive.

As to Plaintiff's SAP account, Defendants deleted this data in December 2017, several months after this lawsuit was filed. Accordingly, at the time Plaintiff's SAP account was deleted, Defendants were on notice of Plaintiff's claims and – as discussed above – knew or should have known that Plaintiff's SAP account would contain data relevant to her overtime compensation claims under the FLSA and the NYLL.

This Court concludes, however, that Defendants acted negligently, and not with culpable intent. As an initial matter, defense counsel appears not to have understood the relevance of SAP data until she received Plaintiff's first request for the production of documents in March 2018. (Kundar Decl. (Dkt. No. 50) ¶ 23) After receiving Plaintiff's requests, defense counsel requested the SAP data from Defendants. She then learned that there had been a "glitch" in the system that had caused Plaintiff's SAP account to be deleted along with her email. (Id. ¶ 26; Buist Decl. (Dkt. No. 52) ¶ 7) After discovering this deletion, defense counsel and Defendants worked to reproduce the missing data, expending significant resources in doing so. (Kundar Decl. ¶¶ 27, 37) While the record here demonstrates that Defendants were negligent in failing to preserve Plaintiff's SAP account, the record does not demonstrate that Defendants destroyed Plaintiff's SAP account with the "'intent to deprive [her] of the information's use in litigation.'" Leidig, 2017 WL 6512353, at *11 (quoting Fed. R. Civ. P. 37(e)(2)(A)-(C)) (emphasis in Leidig).[7]

---

[7] To be sure, defense counsel's conduct in this litigation has been troubling. She discovered in March and April 2018 that Plaintiff's emails and SAP data, respectively, had been deleted (Kundar Decl. (Dkt. No. 50) ¶¶ 24, 36), but she did not disclose the deletions to the Court or

26

The cases relied on by Judge Wang (R&R (Dkt. No. 89) at 30-31) are not to the contrary. See O'Berry v. Turner, No. 7:15-CV-00064-HL, 2016 WL 1700403, at *1, *4 (M.D. Ga. Apr. 27, 2016) (intent to deprive found where plaintiff, the victim of a car accident caused by defendants' truck driver, requested that defendants "preserve driver logs, information gathered from the truck, and information about the truck itself"; after receiving this request, defendants allowed "[t]he [relevant] documents [to be] moved from one building to another, during which individuals unaware of their importance had access to and control over the information," which was lost); GN Netcom, Inc. v. Plantronics, Inc., No. CV 12-1318-LPS, 2016 WL 3792833, at *7 (D. Del. July 12, 2016) (defendant was involved in a "hotly-contested antitrust lawsuit between fierce competitors"; intent to deprive found where defendant's senior vice president "repeatedly direct[ed] Plantronics employees to delete emails, despite knowing of the litigation hold, and at least partly out of concern as to how those emails would be used in litigation against Plantronics if they were produced to GN").

In Moody v. CSX Transportation, Inc., 271 F. Supp. 3d 410 (W.D.N.Y. 2017), also cited by Judge Wang, plaintiff was struck by a train and dragged approximately twenty feet, resulting in severe injuries. Moody, 271 F. Supp. 3d at 414. Defendant CSX

_____

opposing counsel until July 26, 2018. (Id. ¶ 34) Defense counsel's explanation for the delay is that she thought that "Defendants might yet find a substitute way to provide what had been deleted." (Id. ¶ 30) This belief does not excuse the obligation to make a timely disclosure. To be clear, once counsel discovered that relevant information had been destroyed, disclosure should have been made immediately.

In making a determination as to intent, however, the Court must also consider Defendants' efforts to recover the SAP data. Defendants have devoted substantial resources to this task, and have recovered "tables from the SAP system from 2014, 2015, 2016, and 2017, which show the time Plaintiff used the SAP system to enter orders." (Kundar Decl. (Dkt. No. 50) ¶ 39; see also Pltf. Obj. (Dkt. No. 95) at 9 ("Defendants produced partially recovered SAP data.") This Court concludes that while Defendants were negligent in failing to preserve Plaintiff's SAP account, Plaintiff has not demonstrated that Defendants acted with an intent to deprive.

uploaded certain event recorder data from the locomotive within hours of the accident. Id. at 426. That data was relevant to "(1) whether the bell and/or horn were sounded prior to train movement, (2) how fast the train was moving when Moody was struck; and (3) whether the brakes had been applied." Id. Over the next four years, CSX never checked whether the data had been properly uploaded, but destroyed the original source of the event recorder data. Id. at 426, 428. It later emerged that the data had not been properly uploaded. Id. at 423. The district court found that "[t]he proposition that a sophisticated railroad transportation corporation such as CSX could be involved in a serious accident in which an individual lost a limb and thereafter fail for four years to review critical data relating to how that accident occurred is unfathomable." Id. at 426-27. The court further concluded that CSX had acted with intent to deprive, because the destroyed evidence was "the most important evidence," and the defendants' decision to override the original source of the data was "so stunningly derelict as to evince intentionality." Id. at 431.

Here, the circumstances are not nearly as severe. Defendants deleted Plaintiff's email account at a time before their obligation to preserve had been triggered. Although (1) Defendants also deleted Plaintiff's SAP account, and (2) the SAP account contains data that is relevant to Plaintiff's overtime compensation claim, the SAP account is not a record of hours worked, and is not "the most important evidence" of her overtime claims. Moreover, once Defendants learned that Plaintiff was requesting the SAP data, they made expeditious efforts to recover the data, and succeeded in retrieving much of what had been lost.

In sum, while the record demonstrates that Defendants did not take "reasonable steps" to preserve Plaintiff's SAP account, it does not demonstrate that Defendants acted with a culpable state of mind in destroying the SAP account.

## E. Whether Plaintiff Has Been Prejudiced by the Destruction of the SAP Account

Where, as here, a party acts negligently and not with intent to deprive, Rule 37(e)(1) "permits the imposition of sanctions only when there is 'prejudice to another party from loss of the information.'" Leidig, 2017 WL 6512353, at *12 (quoting Fed. R. Civ. P. 37(e)(1)) "The advisory committee's note to the 2015 amendment of Rule 37(e)(1) stated that '[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation.'" Id. (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment) (alterations in Leidig). "The Advisory Committee further cautioned that '[t]he rule does not place a burden of proving or disproving prejudice on one party or the other,' and that '[t]he rule leaves judges with discretion to determine how best to assess prejudice in particular cases.'" Id. (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment) (alterations in Leidig).

Judge Wang states that "[p]rejudice to Plaintiff from the deletion of her email and SAP account is apparent." (R&R (Dkt. No. 89) at 28) Judge Wang focuses on the deletion of Plaintiff's email account, however, and does not analyze whether Plaintiff was prejudiced by the loss of her SAP account.

Plaintiff argues that she has been prejudiced by the destruction of her SAP account, "as she will be unable to rebut Defendants' defenses," including that (1) "Plaintiff did not work more than forty hours [per week]"; (2) Defendants lacked knowledge of the same; and (3) Plaintiff falsely reported her hours. (Pltf. Br. (Dkt. No. 46) at 28) Plaintiff contends that the SAP data Defendants recovered "only shows order entry, and does not contain login times, or

29

evidence of other use and activity such as running reports, which Plaintiff did frequently." (Pltf. Response (Dkt. No. 108) at 15)

Defendants argue, however, that Plaintiff has not been prejudiced by the loss of the SAP data because Defendants were able to "produce[] SAP data from 2014-2017, more than 1,000 pages of Plaintiff's daily computer log-in records for two computers, weekly attendance sheets, a list of Plaintiff's absences, and work schedules for Plaintiff's use in confirming her work hours." (Def. Br. (Dkt. No. 53) at 20)

This Court is not prepared to resolve this dispute on the current record. As noted above, Judge Wang did not separately consider the degree to which Plaintiff has been prejudiced by the loss of the SAP data, and it is not clear to this Court whether the log-in information available for Plaintiff's computers – together with the recovered SAP data and the other information reflecting Plaintiff's hours and work schedule – will permit Plaintiff to reconstruct the hours she worked. Assuming arguendo that Plaintiff has been prejudiced, it will be necessary to determine an appropriate sanction. Judge Wang recommends an adverse inference instruction, but that resolution is not appropriate in light of this Court's finding that Defendants did not act with culpable intent. See Fed. R. Civ. P. 37(e). Moreover, the parties have not briefed the issue of what an appropriate Rule 37(e)(1) sanction would be.

Accordingly, this matter will be remanded to Judge Wang for purposes of determining whether Plaintiff has been prejudiced by the loss of her SAP account and, if so, determining an appropriate sanction.

## III. ATTORNEYS' FEE AWARD

Judge Wang granted Plaintiff's application for an award of attorneys' fees and costs based on her findings in the R & R that (1) Defendants did not take reasonable steps to

30

preserve relevant ESI; and (2) Plaintiff was prejudiced by the loss of relevant ESI. (See Order (Dkt. No. 90)) Defendants have objected to this order. (Dkt. No. 99)

In light of this Court's findings regarding Plaintiff's spoliation claim, Defendants' objection to the award of attorneys' fees and costs is sustained. If appropriate based on Judge Wang's determinations as to the SAP account and prejudice to Plaintiff, Plaintiff may renew her request for an award of attorneys' fees and costs.

## CONCLUSION

For the reasons stated above, Plaintiff's objections to the R&R are overruled. Defendants' objections are sustained in part and overruled in part. The Clerk of Court is instructed to terminate the motion (Dkt. No. 42). The matter is referred again to Judge Wang for further proceedings consistent with this opinion.

Dated: New York, New York
September 30, 2019

SO ORDERED.

Paul G. Gardephe

Paul G. Gardephe
United States District Judge

31